COMMONWEALTH OF MASSACHUSETTS, Plaintiffs,

v.

Cecil D. ANDRUS, Secretary, United States Department of the Interior, Juanita Kreps, Secretary, United States Department of Commerce, Defendants,

Atlantic Richfield Company et al., Defendant-Intervenors.

CONSERVATION LAW FOUNDATION OF NEW ENGLAND, INC., et al., Plaintiffs,

v.

Cecil D. ANDRUS, Secretary, United States Department of the Interior, Juanita Kreps, Secretary, United States Department of Commerce, Richard A. Frank, Administrator, National Oceanic and Atmospheric Administration, Defendants,

Atlantic Richfield Company et al., Defendant-Intervenors.

Civ. A. Nos. 78–0184–MC, 78–0186–MC.

United States District Court, D. Massachusetts.

Nov. 5, 1979.

Jose R. Allen, Asst. Atty. Gen., Boston, Mass., Irwin L. Schroeder, William B. Morrison, John J. Zimmerman, Asst. Attys. Gen., Bruce C. Rashkow, Resources Division, Dept. of Justice, Washington, D.C., for plaintiffs.

Kenneth P. Nasif, Boston, Mass., for defendants Andrus and Kreps.

Harrison A. Fitch, New England Legal Foundation, Boston, Mass., for Greater Boston Chamber of Commerce, N.E. Council, Greater Providence Chamber of Commerce, New Bedford Chamber of Commerce.

Edward L. Selgrade, Mass. Office of Energy Resources, Boston, Mass., amicus curiae for Gov. King.

Edward F. Bradley, Jr., Tupper & Bradley, Boothbay Harbor, Me., for intervenor City of New Bedford.

E. Edward Bruce and Mark D. Nozette, Covington & Burling, Washington, D.C., J. Berry St. John, Jr., Liskow & Lewis, New Orleans, La., G. Marshall Moriarty and John C. Kane, Jr., Ropes & Gray, Boston, Mass., for intervenor-defendant Atlantic Richfield Co. et al.

Douglas I. Foy, Boston, Mass., for Conservation Law Foundation of New England, Inc.

## STATEMENT OF REASONS FOR DENIAL OF REQUEST FOR PRELIMINARY INJUNCTION

McNAUGHT, District Judge.

The plaintiffs have asked that the court enjoin the defendant, Cecil D. Andrus, Secretary of the Interior, from receiving or opening bids for Outer Continental Shelf Lease Sale 42, scheduled for November 6, 1979 in the State of Rhode Island.

The matter came on for hearing on both the request for a preliminary injunction and on cross-motions for summary judgment. The court will rule presently, solely on the request for injunctive relief.

The history of this litigation up to February 20, 1979, is set forth in the opinion written by Circuit Judge Campbell, when the Court of Appeals concluded that a preliminary injunction was not then needed to ward off any threatened irreparable harm. The opinion described the suit filed by the

Commonwealth of Massachusetts and conservation groups seeking to enjoin the Secretary of the Interior from proceeding with the opening of bids on January 31, 1978. When the District Court (in the person of W. Arthur Garrity, Jr.) issued a preliminary injunction forbidding the Secretary from taking further steps to consummate the sale, the sale was cancelled. Then the appeal was taken which resulted in the February 20, 1979 decision. Judge Garrity, after three days of hearing and the submission of documentary evidence, ruled that the plaintiffs would likely prevail on the merits because the Secretary of the Interior had committed several statutory violations. He found that the Secretary had violated the Outer Continental Shelf Lands Act (OCS-LA) by not taking all steps reasonably possible to preserve the fishery resources of Georges Bank. The steps in the form of safeguards which should have been taken included an oil spill liability fund, a fishermen's gear compensation fund, and a procedure for compensating lessees whose drilling operations would be suspended because of unforeseen environmental hazards. Subsequently, Congress passed the Outer Continental Shelf Lands Act Amendments, Pub.L. No. 95–372, 92 Stat. 629, which Amendments included the provisions "the absence of which had so troubled the District Court." *Commonwealth of Massachusetts et al. v. Andrus et al.*, 594 F.2d 872, 880, fn. 10 (1st Cir. 1979). The Court of Appeals held, at page 883, that to the extent that the intended object of the injunction was to hold up the sale until Congress could enact legislation concerning the oil spill fund, gear compensation, and suspension of drilling, the issue was moot.

The Appeals Court considered the other grounds cited by the District Court in granting the equitable relief. These related to alleged deficiencies in the Environmental Impact Statement. The flaws in the Environmental Statement found by the District Court with regard to pending legislation, cost estimates for the fouling of beaches on Martha's Vineyard and Cape Cod, and inadequate response by the Department of the Interior to comments of the Environmental Protection Agency on the final impact statement, did not provide a basis for continuing the preliminary injunction. At page 886 of its opinion, the Court of Appeals stated:

> We therefore leave it open, for future ruling by the district court, whether the amendments [to the Outer Continental Shelf Land Act] provide any reason to modify what is our tentative decision, that the environmental impact statement should be extended to include a discussion of the marine sanctuary alternative. The court should also consider the issue in light of the Supreme Court's *Vermont Yankee* opinion. [*Vermont Yankee Nuclear Power Corp. v. N.R.D.C.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).]

On May 25, 1979, the Department of the Interior published a draft, supplemental Environmental Impact Statement (DSES). A "comment period" was scheduled, and on the advice of the Environmental Protection Agency, the Department of the Interior extended that period to July 16, 1979. Comments were received from organizations, agencies and individuals, including the National Oceanic and Atmospheric Administration (NOAA) with the Department of Commerce. The Final Supplemental Environmental Impact Statement (FSES) was published August 3, 1979. On September 28, 1979, the Department of the Interior released its Secretarial Issues Document and published a Notice of Sale, 44 Federal Register 56042.

On October 5, 1979, a Second Notice of Sale was issued scheduling the lease sale for November 6, 1979, 44 Federal Register 57512. Amended complaints have been filed by the plaintiffs, challenging the legality of the Secretary's decision to proceed with the lease sale.

On May 10, 1979, the Conservation Law Foundation, among others, nominated Georges Bank as a unit, as a marine sanctuary. The Bank was declared an active candidate for nomination by NOAA on August 10, 1979, 44 Federal Register 47132. Hearings were held in Maine and Massachusetts, and

on September 21, NOAA withdrew Georges Bank as an active candidate for nomination as a marine sanctuary.

The plaintiffs repeat many of the contentions which were offered to the District Court when the first injunction was sought, with additional arguments concerning the marine sanctuary issue, the duty of the Department of Commerce, and the effects of the proposed lease sale on endangered whales.

Factors to be considered in deciding the plaintiffs' motion for a preliminary injunction are: (1) whether or not the plaintiffs have demonstrated that they have a reasonable prospect of succeeding on the merits; and (2) whether or not the plaintiffs will suffer irreparable harm in the event that a preliminary injunction is not issued.

I take the considerations in reverse order. Although aware of the decisions by Judge Garrity of this court and by the Court of Appeals, I have had difficulty in finding *immediate* and irreparable harm to the plaintiffs in the event that the lease sale goes ahead. I find the statement of Mr. Justice Marshall pertinent. *See New York v. Kleppe*, 429 U.S. 1307, 1312–13, 97 S.Ct. 4, 50 L.Ed.2d 38 (1976). At least at first blush, it appears that the opening of bids on November 6, 1979 would not involve an irreversible commitment by the Secretary of the Interior. As Mr. Justice Marshall stated, an irreversible commitment cannot occur, at least until a bid is accepted, which may not happen for thirty (30) days. Indeed, physical harm to the environment would not occur until the exploratory drilling began. On the other hand, as District Judge Garrity and Circuit Judge Campbell have pointed out, permitting the acceptance of bids could have irreversible consequences in other respects. Property rights might vest in lessees as soon as the lease is executed, and this is a matter of concern, although the lease-cancellation authority of the Secretary of the Interior has been broadened under the Amendments to the OCSLA. It seems certain that, on the lease sale date, the Secretary of the Interior will not have promulgated regulations requiring the use of best available and safest technologies on all drilling and production operations (BAST regulations). It may be, as argued by the plaintiffs, that the non-existence of the regulations on November 6 could have the consequence of rendering them inapplicable to Lease Sale 42 operations. On such basis, therefore, I am willing to accept the proposition that, if irreparable harm is to occur by reason of the lease sale, such harm would be immediate.

Plaintiffs argue in their brief that Judge Garrity balanced the equities and issued a preliminary injunction; that the present situation is directly analogous to the one that existed before him; and that the "law of the case" is that a preliminary injunction should issue. I find such reasoning fallacious. The situation has indeed changed since Judge Garrity considered the matter before him and decided upon the issuance of the injunction. It is true that equities remain approximately the same: the alleged threat to the commercial and recreational fishing of Georges Bank, as opposed to the nation's need for domestic energy supplies. The measurement of these supposed competing interests, the interests of the fisheries to the interests of those seeking to tap underseas oil and gas deposits, is precisely what makes this case such a difficult one. Much has occurred since Judge Garrity made his decision. There have been amendments to OCSLA. There has been a nomination of Georges' Bank as a marine sanctuary and a withdrawal of that nomination. There have been more public hearings. There has been more dispute, and the tendering of more arguments as to the proper solution.

I turn, therefore, to the question whether the plaintiffs have demonstrated a reasonable prospect of success on the merits, and my conclusion is in the negative.

■ The underlying actions here are essentially appeals from an administrative decision by the Secretary of the Interior to proceed with Land Sale No. 42. The appeals are taken pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* The decision by the Secretary to proceed

with the sale must be supported by appropriate, sufficient environmental impact statements and by conduct. This requires that the court review the Administrative Record which has been supplied to it. The Court of Appeals has set out clearly for us the requirements of an Environmental Impact Statement, as required by Section 102(2) of the National Environmental Policy Act, 42 U.S.C. § 4332(2). The court has outlined the three purposes of the statement with particular emphasis upon good-faith reasoned analysis in response to comments from responsible experts or sister agencies. The Court of Appeals has also stated clearly that a court, in ensuring compliance with these standards, is governed by a "rule of reason" and may not use minor lapses in the statement as an excuse to thwart actions that it believes to be unwise. See 594 F.2d at 884. The plaintiffs have not established to my satisfaction, at this stage of the proceedings, that the Final Supplemental Environmental Impact Statement of the Department of the Interior was inadequate. Plaintiffs have attacked the Environmental Impact Statement and the Supplement, occasionally using general charges which are of little assistance to the court. I deal, therefore, with those specific charges made by plaintiffs which I deem to be worthy of comment at the present time. This is not to say that I have ignored any of the charges of alleged deficiencies in these statements which have been made by the plaintiffs.

After a consideration of the matters presented at the hearing and by way of briefs and memoranda, I am not satisfied that the Statement or the Supplement is inadequate. When one studies the Impact Statement and the Supplement, he finds a detailed statement concerning the Environmental Impact of the proposed action and a study of alternatives, as well as discussion of the environmental consequences of such alternatives. The plaintiffs have contended that NOAA's decision to join in the Department of the Interior's management of Georges Bank, pursuant to OCSLA, rather than designating the area a marine sanctuary, requires the preparation of an Environmental Impact Statement (EIS) by the NOAA. The defendants reply that NOAA's decision was one not to continue with the Georges Bank marine sanctuary process; that NOAA had taken no action affecting the environment, nor made a proposal for one. Defendants argue that, if any EIS was required, the Department of the Interior's statement could have served the purpose. The Department of the Interior, in the Supplemental Environmental Impact Statement, dealt at length with the possibility of a marine sanctuary being designated on Georges Bank. The nomination of the Bank as a marine sanctuary was considered exhaustively. It appears that the Secretary of Commerce separately considered the designation of all or part of the Bank as a sanctuary. The Secretary of Commerce decided that marine sanctuary status was not presently necessary. Her decision and the Administrative Record pertinent to it have been filed with the court. Although I was troubled by this matter at the outset, I am not satisfied that the law required the filing of an Environmental Impact Statement by the Secretary of Commerce, which might simply be duplicative of similar work done by the Department of the Interior. It is true that the Department of Commerce had been critical of the Department of Interior's Environmental Impact Statement. Such criticism, at one stage of the proceedings however, does not mean that a subsequent decision to go along with a decision of the Department of the Interior was arbitrary. Contacts between the two departments resulted in the addition of safeguards to the sale proposal, including deletion of 12 environmentally sensitive tracts. Lease stipulations were also agreed upon, designed to provide protection for the environment. I would be unable to find arbitrariness or capriciousness on the part of the Secretary of Commerce on the basis of the materials and arguments put forth to the present time. I am conscious of the distinction made by the Court of Appeals, 594 F.2d 872, at 885, between the management objectives of the Secretary of Commerce and the Secretary of the Interior. I note particularly

that Circuit Judge Campbell stated, "These considerations strongly suggest that the environmental impact statement should discuss the possible applicability of the Marine Sanctuaries Act." This was directed to the Secretary of the Interior, not to the Secretary of Commerce. I note parenthetically only that the court questioned whether plaintiffs' failure to seek a study of the possible application of the Marine Sanctuaries Act at some earlier date precludes the matter now. The Court cited the *Vermont Yankee Nuclear Power Corp.* decision, 435 U.S. at 553–54, 98 S.Ct. 1197. I find that *Vermont Yankee* would not prevent plaintiffs' from presenting this matter for consideration—but rule adversely to the plaintiffs on the subject.

 The plaintiffs have attacked vigorously an alleged failure on the part of the Department of the Interior to perform an adequate analysis of the Bay of Campeche "blowout." This argument I cannot accept. Obviously, an analysis of that oil spill, which occurred so recently, would be impossible. Much research will have to be done before one may be able to analyze that particular event. Since the conditions under which the blowout occurred, its causes and what might have been done to prevent it, are unascertainable, it would be unreasonable to prevent the leasing of areas on the Outer Continental Shelf until such a study was completed. We know neither when or if such data will be forthcoming. I see no reasonable prospect of the plaintiffs succeeding on the basis of alleged violations of the Fishery Conservation and Management Act, 16 U.S.C. § 1881, the Marine Protection, Research and Sanctuaries Act, 16 U.S.C. § 1432, the National Environmental Policy Act, 42 U.S.C. § 4321, nor the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 with amendments. One statute was of particular concern in the hearing, the Endangered Species Act, 16 U.S.C. § 1531. 16 U.S.C. § 1536(a) provides that each federal agency shall ensure that action authorized or carried out by it does not jeopardize the continued existence of any endangered species. It appears that the National Marine Fisheries Service of the Department of Commerce conducted an examination and thereafter notified the Secretary of the Interior that its review was inconclusive as to whether the continued existence of humpback and right whales might be jeopardized. The Secretary then entered into the consultation process required by the statute. Plaintiffs insist that the lease sale would constitute an irretrievable commitment of resources under § 1536(d). Plaintiffs point to an opinion in *Nebraska v. Rural Electrification Administration*, reported at 12 ERC 1156, wherein at 1172, a judge of the United States District Court for the District of Nebraska, according to plaintiffs, held that the making of commitments by the Rural Electrification Administration foreclosed consideration of modifications or alternatives that would endanger the whooping crane and its habitat. A close study of that opinion indicates that the judge spoke both of the making of commitments and allowing construction to begin as amounting to a type of irreversible commitment. In this case, for example, an irretrievable or irreversible commitment would obviously be made within the meaning of the state if the leasehold sale were held and subsequent drilling actually began.

This case does not present the type of irreversible commitment involved in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the so-called "snail darter" case. At any rate, it appears that the Secretary has incorporated safeguards into the lease operations and the proposed lease stipulations themselves. See Lease Stipulations No. 2, 4 and 6. Finally, if operations under a particular lease would jeopardize the existence of the whales, the Amendments to the OCSLA permit the Secretary to cancel the lease. 43 U.S.C. § 1334(a)(2)(A).

 The plaintiffs in this case have emphasized the duty of the defendant Secretary of the Interior, as it has been defined in the decision of the Court of Appeals on February 20, 1979. They have quoted correctly from the opinion and its comments on

the Secretary's duty to protect fishing. The Court of Appeals stated clearly that the OCSLA places the Secretary under a duty to see that gas and oil exploration and drilling is conducted without unreasonable risk to the fisheries. "His duty includes the obligation not to go forward with a lease sale in a particular area if it would create unreasonable risks in spite of all feasible safeguards." 594 F.2d 872, at 889. The Court of Appeals went further and said, also at page 889, "It is left to the Secretary to harmonize the interests of the various resources wherever they impinge upon one another. . . . Some adverse effects on fishing and the coastal environs were doubtless anticipated, as the legislative establishment of oil spill and fishermen's gear funds indicates; but we think the underlying assumption was that both sets of interests—those concerned with the preservation of the fishery resource for future use by mankind, and those concerned with securing the extraction of oil and gas—can be served. Where the two sets of interests conflict, where particular mineral leases threaten particular fishing interests, the Secretary must determine which interests must give way, and to what degree, in order to achieve a proper balance." A judge can countermand the Secretary's orders and actions only if they are arbitrary, capricious, or illegal. I cannot find a reasonable prospect of the plaintiffs' establishing at a hearing on the merits that the Secretary has acted "so outrageously that we would be justified in summonsing the kind of power that courts occasionally exercise to control those who flout their process." 594 F.2d at page 888.

█ The plaintiffs allege that the Secretary has acted in such manner that he has breached his "common law duty" or duty which is derived from the OCSLA, FCMA, NEPA and the common law which forbid unreasonable risk in the Georges Bank fishery area. One particular argument along this line is appealing. Plaintiffs point to the fact that there will be no pre-sale promulgation of BAST regulations as a measure of post-lease environmental protection. Such formulation and promulgation obviously would have been desirable. See 594

F.2d at page 887, wherein plaintiffs' fears that the Secretary would not fulfill his duty in time were related by the Court of Appeals. The court's comment at that time was that "all of this may be true, but it affords no reason for continued injunctive relief at this point." The Court of Appeals emphasized the limited power of the District Court and other federal courts. I have no reason not to believe that the Secretary will impose best available and safest technology requirements subsequent to the sale. Continuous control appears to be part of the lease terms.

In summary, Congress, to paraphrase the Court of Appeals decision in *Commonwealth of Massachusetts v. Andrus*, made a national commitment to the intelligent use of all of our natural wealth. Congress wanted to expedite the development of oil and gas resources and intended that it be done without serious damage to the renewable resources of the Outer Continental Shelf, a continuing important source of food and protein to the nation and to the world. Congress left it to the Secretary to develop policies resulting in the extraction of oil and gas without unreasonable risks and damage to renewable resources such as fish. 594 F.2d at 892. The Secretary is carrying out that duty and before this court can interfere with its performance, by way of granting preliminary injunctive relief restraining the sale of the leasehold interests, it would have to appear to the court that the law and the posture of the case make it likely that the plaintiffs would succeed on the merits. On the presentation that has been made, on the law as it is interpreted by this court, it is unlikely that I would find at a hearing on the merits that the Secretary's decision to go ahead with the leasehold sale on November 6, 1979 was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law. The motion of the plaintiffs in these cases for preliminary injunctive relief must be, and is therefore, denied.