689 F.2d 222
 17 ERC 2097, 223 U.S.App.D.C. 39, 12
Envtl. L. Rep. 21,103
 VILLAGE OF KAKTOVIK, et al.
v.
James G. WATT, Secretary of the Department of the Interior,
et al., Appellants.
NORTH SLOPE BOROUGH, et al.
v.
James G. WATT, Secretary of the Department of the Interior,
et al., Appellants.
NATIONAL WILDLIFE FEDERATION, et al.
v.
James G. WATT, in his official capacity as Secretary, U. S.
Department of the Interior, et al., Appellants,
Amoco Production Company, Intervenor-Defendant.
 Nos. 81-1752, 81-1753, 81-1774.
 United States Court of Appeals,
District of Columbia Circuit.
 
 Argued 5 May 1982.
Decided 1 Oct. 1982.
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Action Nos. 79-3216, 79-3193 and 79-3199).
 Kathryn A. Oberly, Sp. Lit. Counsel, Dept. of Justice, Washington, D. C., for appellants in Nos. 81-1752, 81-1753 and 81-1774.
 Bruce J. Terris, with whom James M. Hecker, Nathalie V. Black and Robert S. Blacher, Washington, D. C., were on the brief, for North Slope Borough, et al., appellees in No. 81-1753.
 Clifton E. Curtis, Washington, D. C., was on the brief for Village of Kaktovik, et al., appellees in No. 81-1752.
 Patrick A. Parenteau, Washington, D. C., was on the brief for Nat. Wildlife Federation, et al., appellees in No. 81-1774.
 E. Edward Bruce and Richard A. Meserve, Washington, D. C., were on the brief for amici curiae Atlantic Richfield Co., et al., urging reversal of the attorneys' fees orders in Nos. 81-1752, 81-1753 and 81-1774.
 Before ROBB and WILKEY, Circuit Judges, and HAROLD H. GREENE,* United States District Judge for the District of Columbia.
 Opinion for the Court filed by Circuit Judge WILKEY.
 Opinion concurring in part and dissenting in part filed by United States District Judge GREENE.
 WILKEY, Circuit Judge:
 
 
 1
 This is an action for attorneys' fees and costs brought by plaintiffs/appellees, the Alaskan Village of Kaktovik, the Alaskan governmental entity of North Slope Borough, and the National Wildlife Federation. Plaintiffs challenged the decision of defendant/appellant Secretary of the Interior to conduct the Beaufort Sea Outer Continental Shelf lease sale, alleging that the proposed sale would violate the Outer Continental Shelf Lands Act (OCSLA),[1] the Endangered Species Act (ESA),[2] other federal statutes and treaties protecting arctic marine resources, and a special "trust responsibility" to Alaskan Native Americans.
 
 
 2
 We conclude that plaintiffs/appellees are not entitled to an award of attorneys' fees. Part I considers the plaintiffs' claim to an award under the OCSLA and ESA. Part II addresses the enforceability of a settlement agreement reached by the plaintiffs with the Department of Justice prior to litigation on the merits of the attorneys' fees issues. Because we find an award inappropriate on either ground, we reverse the decision of the district court awarding plaintiffs in excess of $230,000 in attorneys' fees and costs.[3]
 
 
 3
 * Plaintiffs ultimately lost on all issues,[4] but, some may be surprised to find, this need not bar the award of attorneys' fees and costs under the relevant provisions of OCSLA[5] and ESA.[6] However, we think it inappropriate for such an award to be made in today's case.
 
 
 4
 Our decision today in no way reflects on plaintiffs' counsel, whom the trial judge described as "excellent,"[7] and of "ability rarely presented ... (and) the most exacting skill."[8] He concluded that they "could not have served their clients better."[9] We, too, were impressed with the quality of counsel, both on the merits and on the attorneys' fees issue. Nonetheless the statutes, their legislative histories, and the recent case law in this area all lead us to conclude that an award here would be inconsistent with congressional intent. Put in simplest terms, plaintiffs' litigation here was not so "exceptional"[10] and such a "substantial contribution( ) to the statutory goals"[11] of the underlying acts that an award is appropriate.
 
 
 5
 The Supreme Court, in Alyeska Pipeline Service Co. v. Wilderness Society,[12] limited the opportunity to obtain public interest fees in the federal courts to those situations where there is specific statutory authority. Plaintiffs argue that the attorneys' fees provisions in both OCSLA and ESA contain such authority for an award to them here. Both statutes authorize awards "whenever the court determines such award is appropriate."[13] The issue, then, is whether an award in this case is "appropriate" within the meaning of the statutes.
 
 
 6
 Last February this court published a trilogy of decisions involving the interpretation of the word "appropriate" in attorneys' fees statutes like the ones before us today. It is hardly necessary for us to retrace the analysis so painstakingly undertaken in those cases, and we will simply restate the principles we can glean from them.[14] Thus, Sierra Club v. Gorsuch[15] stated that courts are allowed "to award attorneys' fees to parties who have 'substantially contributed' to the goals" of the underlying statute.[16] Whether such a substantial contribution was made is to hinge on the importance, complexity, and novelty of the issues raised, and on the aid rendered in interpreting and implementing the act.[17] Environmental Defense Fund, Inc. (EDF) v. EPA[18] quoted approvingly from the remarks made by Senator Tunney during the passage of the attorneys' fees provision of the Toxic Substances Control Act that, while "a successful plaintiff 'should ordinarily recover in (sic) attorneys' fee unless special circumstances would render such an award unjust,' " awards might also be appropriate "where such award is in the public interest without regard to the outcome of the litigation."[19] Senator Tunney was also quoted to the effect that "appropriate" was "a word which should (be) liberally construed to effectuate the purposes of this act."[20] Finally, in Alabama Power Co. v. Gorsuch,[21] we embraced the "valuable guidance ... abundantly afford(ed)" by Sierra Club and EDF, concluding that in determining whether an award is appropriate "the dominant consideration is whether litigation by that party has served the public interest by assisting the interpretation or implementation"[22] of the underlying statute.
 
 
 7
 Applying these principles to the matter today convinces us that the district judge-who did not have the advantage of the illumination afforded by these cases at the time he made his award-erred in his decision to grant attorneys' fees and costs. No substantial contribution was made to the goals of ESA or, especially, OCSLA. The public interest was not, on balance, appreciably furthered by the claims. The issues raised lacked the required importance, novelty, and complexity, and the suit helped little in the interpretation and implementation of these statutes. The contributions to the statutory goals in the case before us differ from those made in the February trilogy both because the statutory goals here were different and because the contributions were less.
 
 
 8
 Turning first to the statutory goals involved, we note that the Clean Air Act and Toxic Substances Control Act-the statutes involved in the cases last February-were enacted solely for environmental protection. One of the two acts central to our claim, however,-OCSLA-has as its primary goal expediting the development of our offshore resources, the very end plaintiffs blocked. As a unanimous Supreme Court recently stated:
 
 
 9
 The "basic purpose" of the 1978 Amendments (to OCSLA) was to "promote the swift, orderly and efficient exploitation of our almost untapped domestic oil and gas resources in the Outer Continental Shelf," H.R.Rep.No.95-590, p. 53 (1977), ... and the Amendments were broadly designed to achieve that aim.[23]
 
 
 10
 Litigation and, especially, delay from litigation were to be discouraged-particularly at the pre-development, pre-exploration leasing stage, where the chances of harm to the environment are slim.[24]
 
 
 11
 This is not to say that OCSLA was insensitive to environmental concerns, or that the aims of ESA do not to some degree weigh against the pro-development aims of OCSLA.[25] But the statutory language and history and the Supreme Court's comment do place this case in a statutory context different from those governed by the Clean Air Act or the Toxic Substances Control Act alone. Where the statutes differ, the criteria for a substantial contribution to the statutory goals must differ, too. We must conclude that the contributions made to the underlying purposes of the statutes and to the public interest were less here than in Sierra Club, EDF, and Alabama Power. Indeed, given the specific aims of OCSLA, we cannot say that plaintiffs' action merits an award of attorneys' fees.
 
 
 12
 The inappropriateness of an award is particularly manifest when we weigh-as we think we must-the costs as well as the benefits to the statutory goals and the public interest which resulted from plaintiffs' litigation. It would of course be unwise for judges to weigh too finely the two. But here we must note that the adverse effects of the lawsuit on the expedited development of the nation's energy resources-an explicit aim of OCSLA-and the public treasury were considerable and the benefits to the public meager.
 
 
 13
 The Government asserts that the six-month delay caused by plaintiffs' suit cost $30 million-the sum which would have accumulated, at 15% interest, on the $400 million whose use the Government lost for six months.[26] Considering the other "adverse impacts on our national security and our economy," the Government further estimates a cost to the nation of $50-60 million.[27] It was in fact such considerations that prompted us to issue our order-vacating the district court's injunction against the Secretary's acceptance of bids and issuance of leases-without delay, while the opinion on the merits was being written.[28]
 
 
 14
 Turning to the contributions made by the suit, we must conclude again that we have a situation considerably different from the cases of last February. As we discussed before, contributions are to be weighted according to, inter alia, the importance, novelty, and complexity of the issues raised.[29] Obviously, while we do not wish to trivialize the claims of plaintiffs here, the focus and importance of their action is rather narrower than the national pollution standards at issue in Alabama Power and Sierra Club and the "broad rules governing the disposal, marking, manufacture, processing, distribution, and use of a class of chemicals" in EDF.[30] In Sierra Club, the court devoted a separate section in its decision awarding costs and fees to emphasizing the "importance," " 'magnitude' " and " 'critical implications,' " "across the nation," of the matters at issue-and not only for the environment but for human health and the economy as well.[31] The issues in EDF were characterized as "critically important":[32] " 'Human beings have finally come to recognize that they must eliminate or control life threatening chemicals ... if the miracle of life is to continue and if earth is to remain a living planet.' "[33] As a non-political branch we are reluctant to rank too precisely the nation's priorities, but we can conclude that the admittedly marginal threat to the bowhead whale does not rise to the level of importance the court described in Sierra Club and EDF.
 
 
 15
 Likewise, the issues in the three February cases were decidedly of first impression; in the matter now before us, similar or directly analogous claims had already been adjudicated elsewhere.[34] Finally, while it cannot be said that the OCSLA and ESA issues raised by plaintiffs and dispatched in seven pages in our opinion on the merits[35] were simple, they were at least simpler than those raised in, for example, the 122-page opinion in Sierra Club[36] or the ninety pages we wrote on the merits in Alabama Power.[37] It is difficult to give objective evidence for why a given case is or is not complex, and we recognize that the number of pages devoted to it is at best an uncertain barometer. Still, we have confidence in our evaluation of the relative complexities of these cases since members of this panel were also on the merits panel of North Slope Borough, Sierra Club, and Alabama Power.
 
 
 16
 Thus, with respect to the importance, novelty, and complexity of the issues raised, an award here is less appropriate than in the controlling cases where such an award was made. The contributions were less, enough less that we cannot characterize them as substantial. This is not to say that the issues raised were trivial or uninteresting, or that the country is in no way better off with the resolution of plaintiffs' claims. But it was clear from plaintiffs' briefs and oral argument that despite their counsel's considerable skill it was difficult for them to list any contributions of substance from their suit.[38]
 
 
 17
 Plaintiff North Slope Borough argues that nonetheless "any benefit, consistent with the intent of Congress in enacting the statute authorizing the fee award, is sufficient to warrant an award of fees."[39] We disagree. It is clear from last February's trilogy that something more than that is required. The contribution must be more than visible, it must be "substantial,"[40] even "exceptional."[41] Compared to the claims resolved in Sierra Club, EDF, and Alabama Power, the results from today's litigation are relatively insubstantial and unexceptional. Sierra Club emphasized that "the standard we have applied amounts to much more than a 'non-frivolous' standard."[42] Were an award made to plaintiffs today this assurance of Sierra Club would be effectively denied.
 
 
 18
 Another gauge of the substance of the plaintiffs' contribution is the interpretive and implemental value of their suit.[43] Since, as we have already discussed, the issues raised were less than novel, we must discount the aid the suit afforded to statutory interpretation. We also note here that, although the fact that plaintiffs failed to prevail on any issue is of course not dispositive, it is nonetheless a fact which we may consider in assessing the value of their lawsuit, placed by the District Court at over $230,000 in attorneys' fees and costs.[44] The failure to prevail may undercut the interpretive and implemental usefulness of the suit: the interpretation urged was incorrect, the implementation sought inconsistent with the law.
 
 
 19
 More generally, when an action is ultimately disallowed by the judiciary's construction of a statute, the contribution of that action to the statute's goals is, ceteris paribus, diminished. So is the contribution to the public interest, since we must assume that the statute is in that interest. In Sierra Club -the only one of the three February cases to make an award to a party who had not prevailed on the majority of the issues it brought-we concluded that "the occasions upon which non-prevailing parties will meet such criteria (entitling them to an award) may be exceptional ..., (but this) is such an occasion."[45] Earlier we had quoted approvingly from Delaware Citizens for Clean Air, Inc. v. Stauffer Chemical Company[46] that "an award of counsel fees to a losing party should be reserved for those cases in which either the litigation, though ultimately unsuccessful, serves the objectives of the Act in some substantial way or in which other exceptional circumstances tip the balance of the equities decidedly in the losing party's favor."[47] This suit, while brought in good faith and skillfully argued, was not exceptional.
 
 
 20
 We reiterate that in no way does our denial of an award disparage the good faith of plaintiffs or the excellence of their counsel. And we reemphasize also that the mere fact that a plaintiff is unsuccessful should not blind a court to the possibility that his efforts may nonetheless make an award of attorneys' fees and costs appropriate. Each case, each plaintiff must be judged individually. But having reviewed the claims made by today's plaintiffs and the statutes under which they were brought, it is our conclusion that they did not so substantially contribute to the goals of those statutes and the public interest that an award is appropriate.
 
 II
 
 21
 In the alternative plaintiffs argue that, even if not deserving of an attorneys' fees award under the applicable statutory standards, they are entitled to the award agreed upon in their prior settlement with defendants.[48]
 
 
 22
 To determine whether that settlement agreement is now enforceable, we must first view the course of the negotiations which preceded it. These negotiations began in August 1980, shortly after the district court ruled that plaintiffs were entitled to an attorneys' fees award.[49] A stipulation fixing attorneys' fees at $60,000 was filed in the district court on 21 January 1981.[50] Shortly thereafter, however, the government filed a Notice of Withdrawal from Stipulation.[51] The Notice asserted that the Justice Department had entered into the agreement without proper consultation with the Department of the Interior, that the Interior Department strongly objected to the stipulation, and that the Government therefore withdrew from the stipulation and objected to any reward based upon it. Plaintiffs in response urged the district court to enforce the stipulation.[52]
 
 
 23
 The district court awarded plaintiffs the stipulated amount.[53] The court explicitly did not reach the issue whether the settlement agreement was an enforceable contract. Rather, it held that an award of attorneys' fees was appropriate;[54] and, because it assumed that plaintiffs wished to avoid further litigation over the amount of attorneys' fees, it awarded the stipulated sum.[55]
 
 
 24
 Subsequently, in response to the Government's request for time to consider seeking an appeal,[56] plaintiffs altered their position. Although still "willing( ) to accept the (stipulated) amounts" if paid immediately, plaintiffs urged that "in view of the possibility that the government may appeal the February 3 decision and refuse to honor the stipulation, ... (the court) should reconsider its decision (on the amounts to be paid)."[57] Plaintiffs also submitted records which purported to demonstrate plaintiffs' entitlement to an award more than three times the stipulated amount.[58] In short, the record shows uncontrovertibly that plaintiffs no longer insisted on enforcement of the settlement agreement.[59] It was thus at the instance of both parties that the court vacated its earlier order and proceeded to try the merits of the attorneys' fees issues.[60]
 
 
 25
 Plaintiffs argue that the settlement agreement entitles them to an award equal to the previously stipulated amount.[61] Having decided against plaintiffs on the merits, we must reach the issue whether the prior settlement is now enforceable. We hold that it is not.
 
 
 26
 An agreement to settle a legal dispute is a contract.[62] Each party agrees to extinguish those legal rights it sought to enforce through litigation in exchange for those rights secured by the contract.[63] When plaintiffs assented to the settlement with the Government, they gave up their legal right to determination on the merits of an award of attorneys' fees. In exchange, they received the Government's binding promise to pay a sum certain.
 
 
 27
 The enforceability of settlement agreements is governed by familiar principles of contract law.[64] A settlement contract may not be unilaterally rescinded.[65] Upon breach by one party, the other party may obtain damages or specific performance as appropriate.[66] Both parties to the contract may, of course, agree to rescind the contract. Willingness to rescind the contract may be inferred from the behavior of the parties.[67]
 
 
 28
 Applying these principles to the present case, we note that, when the Government attempted to withdraw from the agreement, plaintiffs could have enforced it by requesting the district court to enter the appropriate order.[68] They chose not to do so. Instead, they sought to litigate the merits of the dispute the contract had purported to settle.[69] Plaintiffs' hopes for recovery were certainly raised by the district court, which described the $60,000 settlement as "modest,"[70] and by this courts' decision in Metropolitan Washington Coalition for Clean Air v. District of Columbia,[71] which came down between the time of the settlement and plaintiffs' request for reconsideration. Plaintiffs had every reason to think that they could get much more than $60,000 by abandoning the contract and litigating the merits-which is what they proceeded to do. Only now, because they have lost on the merits, do they request enforcement of the settlement agreement.
 
 
 29
 We hold that, by requesting an opportunity to litigate the merits of the attorneys' fees issues and by then proceeding to do so, plaintiffs consented to rescission of the settlement contract. The plaintiffs then took the same position as the government: forget the settlement agreement; decide this claim for attorneys' fees on the merits. A live and enforceable settlement simply cannot coexist with a party's efforts to acquire a court determination of the very issues the settlement was supposed to resolve without litigation.[72] Any other rule would subvert the policies underlying the enforcement of settlement agreements. "Judges and lawyers alike strive assiduously to promote amicable adjustments of matters in dispute .... When the effort is successful, the parties avoid the expense and delay incidental to litigation of the issues; the court is spared the burdens of a trial, and the preparation and proceedings that must forerun it."[73] If the plaintiffs' position were adopted, to the contrary, settlement would simply engender further litigation: rather than enforcing a breached settlement, the other party would seek to obtain a better ruling on the merits, and fall back on the settlement only after losing at trial. Plaintiffs' conduct here exemplifies this danger. By reasserting their substantive rights under the relevant statutes, plaintiffs undercut the entire purpose of the settlement-to do away with the need for litigation on the merits.
 
 
 30
 Moreover, if plaintiffs could fall back on a settlement after losing on the merits, this would create a substantial windfall for attorneys whose fee claims are decided against them. In the present case, the plaintiffs would win $60,000 although this court has held them entitled to nothing. Such excessive fee awards drain the public treasury and encourage unnecessary and burdensome litigation. We decline to fashion a rule which gives litigants an undue advantage in negotiating settlements of these issues with the government.
 
 
 31
 Upon anticipatory breach of a settlement contract, therefore, the non-breaching party must choose either to enforce the agreement and perhaps also recover damages resulting from its breach or to litigate the merits.[74] As noted above, plaintiffs received the government's promise of payment of $60,000 in exchange for waiver of their right to litigate the merits. There is no justification for now giving them both the guarantee of $60,000 and an opportunity to litigate the merits, simply because of the government's attempted withdrawal from the settlement. Contractual remedies, including consequential damages, adequately protect parties' rights against breach.[75] Had the plaintiffs wished to enjoy the benefits of the settlement contract, they should have sought to enforce it.[76]III
 
 
 32
 Because we find the plaintiffs entitled to an award of attorneys' fees neither under the relevant statutes nor under their prior settlement agreement, the decision of the district court is
 
 
 33
 Reversed.
 
 
 34
 HAROLD H. GREENE, United States District Judge, concurring in part and dissenting in part:
 
 
 35
 I concur in the result reached in Part I of the court's opinion. Under statutory provisions such as these, a losing party seeking attorneys' fees bears the burden of showing that it has brought an "exceptional" case.[1] These actions fail to meet that test. Not only did appellees lose on every point they raised, but the adjudication of the litigation they initiated added little new to the law.
 
 
 36
 Most of the basic legal issues had been decided by this and other courts before these actions were ever instituted.[2] To be sure, these issues acquired a slightly different cast here because different statutes were involved than those which had been the subject of earlier litigation. But that altered statutory context was ultimately irrelevant: notwithstanding the change in the underlying statutes, the rules of law which were found to be controlling turned out to be the same rules which governed the earlier cases. Any remaining doubt on that score was dissipated when the Court of Appeals for the First Circuit, one month after the filing of the complaint here, and long before the bulk of the attorneys' fees had been expended, resolved most of the questions here involved in the context of the very statutes at issue in these cases.[3] Appellees certainly had a right to continue to maintain their litigation in this Circuit notwithstanding all the precedents against them; but they have no right to receive attorneys' fees for their efforts.
 
 
 37
 These considerations are dispositive of appellees' claim, and it is therefore not necessary to reach the further question of the extent to which the two statutes protect various goals. Clearly, economic as well as environmental concerns are implicated in both the Outer Continental Shelf Lands Act and the Endangered Species Act;[4] I see no need for deciding the difficult question[5] of how much a particular statutory objective sought by a plaintiff must predominate over other purposes of the same law in order to entitle him to attorneys' fees, when such a decision is not necessary to the outcome.[6]
 
 
 38
 In Part II of the opinion the court concludes that the attorneys' fee stipulation entered into by the parties is of no effect and that appellees are not entitled to enforce it. I believe that this conclusion is based upon an erroneous interpretation of the record and that it allows the government excessive freedom to repudiate binding agreements in future cases.
 
 
 39
 The district court properly characterized this fee litigation as having a "sordid history." The parties began to negotiate in August, 1980, and on November 19, 1980, the government made a firm settlement proposal. Further negotiations ensued, and on January 19, 1981, the acting Assistant Attorney General approved a settlement worked out between counsel for the two sides. Two days later, the government filed the settlement papers with the court in the form of a stipulation.[7] On January 30, 1981, without any further contact between the parties, the government notified the court that it would not honor its agreement, stating as a basis only that the Department of Justice had previously failed to consult with the Department of the Interior and that Interior now interposed an objection.
 
 
 40
 There is no question that a settlement agreement is a contract which, like any other contract, may not be unilaterally rescinded. Autera v. Robinson, 419 F.2d 1197, 1201 n.17 (D.C.Cir.1969). See also Dacanay v. Mendoza, 573 F.2d 1075, 1079 (9th Cir. 1978). That principle applies to the government as to any other party,[8] and it applies irrespective of whether or not the agreement has yet been approved by the court.[9] Thus, unless there is some reason why this general rule should be held inapplicable to these particular facts, appellees are entitled to enforce the agreement.
 
 
 41
 It has been suggested that the government's obligation may be voided, first, because the Department of Justice lacked authority to enter into the settlement, and second, because appellees consented to the government's rescission of the agreement.
 
 
 42
 The Justice Department's suggestion, implicit in its January 30, 1981, notification, that absent Interior Department concurrence it was without legal authority to enter into the settlement agreement, is patently without merit.
 
 
 43
 Executive Order No. 6166 states that with respect to any case referred to the Department of Justice "the function of decision whether and in what manner to prosecute, or to defend, or to compromise ... is transferred to (that) Department." Executive Order 6166, § 5 (June 10, 1933). The Executive Order has been interpreted in two Opinions of the Attorney General as vesting in the Department plenary power to settle or to compromise any case on such terms as the Attorney General sees fit. 38 Op.Att.Gen. 98 (1934); 38 Op.Att.Gen. 124 (1934). Thus, "there resides in (another department) no discretion to review on the merits the action of the Attorney General in accepting an offer in compromise." 38 Op.Att.Gen. at 127. Indeed, the Department of Justice's own regulations authorize the Assistant Attorney General in charge of each division to accept offers in compromise of $750,000 or less even when the agency involved is opposed to the proposed compromise. See 28 C.F.R. §§ 0.160, 0.164 (1981).
 
 
 44
 Court decisions have confirmed these unambiguous directives. In United States v. McInnes, supra, 556 F.2d at 441, the court stated:
 
 
 45
 We find clear authorization in 28 CFR § 0.160 for the Assistant Attorney General to compromise and settle the appellees' claims against the United States .... If the Navy objected to the settlement, as the government suggests, then that was for the Assistant Attorney General to consider.
 
 
 46
 See also Halbach v. Markham, 106 F.Supp. 475, 480 (D.N.J.1952), aff'd, 207 F.2d 503 (3d Cir. 1953), cert. denied, 347 U.S. 933, 74 S.Ct. 628, 98 L.Ed. 1084 (1954); United States v. Sandstrom, 22 F.Supp. 190 (N.D.Okla.1938); 28 U.S.C. §§ 516, 519; 28 C.F.R. § 0.65(a)(1).[10]
 
 
 47
 In view of the plain mandate of these authorities, it is difficult to imagine that the government could have believed[11] that there never was a settlement agreement[12] or that, if there was an agreement, it was invalid for lack of Interior Department[13] concurrence.[14] In any event, it does not appear that the majority is persuaded by that contention, whatever its formulation,[15] and, as indicated, neither am I.
 
 
 48
 That leaves, then, the contention, adopted by the majority, that if the government rescinded, it did so with appellees' consent, and that there is therefore no longer any agreement to enforce.
 
 
 49
 I do not find such a consent in the record. As indicated, the government improperly claimed the authority on January 30, 1981, to withdraw from its settlement agreement. Appellees immediately urged the district court not to permit the withdrawal. The court disregarded appellees' protestations, awarding them attorneys' fees based not on the agreement but on the merits of their claim. At the same time, the amount awarded was identical to that provided for in the agreement. In my view, these rulings were in error.[16]
 
 
 50
 Absent statutory provision or other special circumstances, a court is bound to enforce a settlement that is not unjust. See, e.g., United States v. McInnes, supra; United States v. City of Miami, 614 F.2d 1322, 1330 (5th Cir. 1980). The district court here obviously did not believe that the settlement was unjust or otherwise not in the public interest, for it awarded attorneys' fees to appellees in the precise amount called for by that settlement. Under the law, it should therefore simply have enforced the agreement. Instead, as noted, it proceeded to award attorneys' fees on a merit basis; but the method chosen to accomplish this task further complicated the problem. Rather than to compute the amount of the fees in accordance with the formula established by the cases,[17] the court tracked the terms of the stipulation. As will be seen, these actions provided the government with an opportunity and they presented appellees with a dilemma.
 
 
 51
 After the order was entered, the government moved the court for a stay to allow consideration of an appeal. It was in response to that motion that appellees, for the first time, even as much as mentioned the alternative that the court might determine the amount of the attorneys' fees outside the framework of the stipulation.[18] But at that time, too, they stated, again and again, that they were requesting enforcement of the stipulation, arguing, just as they do here, that a stipulation is a contract, binding on the parties irrespective of the relationship between the Departments of Justice and Interior, and enforceable as such. Only if the government persisted in its failure to abide by the agreement, and only if the court did not enforce the agreement, then, according to appellees, attorneys' fees were to be awarded under the Copeland standard.
 
 
 52
 I cannot interpret that position as supporting the conclusion that the merits of the attorneys' fee issue were tried "at the instance of both parties." Majority Opinion at 16. The government had already reneged on the agreement, and the court had already decided to try the merits of the attorneys' fee issue. In that posture, and as a fallback position in case they were unable to change the court's mind, appellees suggested that if the merits be tried, it at least be done in accordance with the governing legal principles. See supra. To construe that suggestion as a joint enterprise by the parties to abandon the stipulation is in my view not only an unrealistic interpretation of the record but it would also unnecessarily reward the government for its breach.[19]
 
 
 53
 Appellees were effectively forced into the position they took by the actions of the government and the court. The district court's order of February 3 purported to award attorneys' fees on the basis of the merits when, in fact, there was no basis for an award on that theory in the amount provided for by the court. The court's decision was thus highly vulnerable to reversal on appeal. What appellees did to avoid what, from their point of view, was the calamity of a certain reversal and at best further delay was to ask the court to clarify its February 3 decision-either to award attorneys' fees based on the settlement or if, notwithstanding appellees' request, it was unwilling to do so, to award attorneys' fees based on the merits of their fee claim. That is a far cry from a rescission of the settlement agreement.
 
 
 54
 On February 3, 1981, by the majority's own reasoning, there was a binding agreement which the court had no basis for refusing to enforce.[20] I would accordingly direct the district court to do that which it should have done on that date-to enforce the agreement. Alternatively, it might be appropriate to remand the cases for a determination by the district court of the question whether appellees actually did intend[21] to rescind the agreement in their February 13, 1981, filing.[22] But I do not see how appellees can, on this record, be denied not only an enforcement of the agreement of January 19, 1981, but even as much as the opportunity to show that they did not intend to rescind.
 
 
 55
 The present situation was brought about by the government's improper actions and the district court's error. Appellees bear no responsibility for either; yet the disposition reached by the court would penalize only them. For the reasons stated, I respectfully dissent.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976)
 
 
 [1]
 43 U.S.C. §§ 1331-56, 1801-02, 1811-24, 1841-47, 1861-66 (1976 & Supp. IV 1980)
 
 
 [2]
 16 U.S.C. §§ 1531-42 (1976 & Supp. IV 1980)
 
 
 [3]
 515 F.Supp. 961 (D.D.C.1981)
 
 
 [4]
 The district court first denied plaintiffs a preliminary injunction against the sale. North Slope Borough v. Andrus, 486 F.Supp. 326 (D.D.C.1979). It next ruled that the Secretary had violated ESA and the National Environmental Policy Act (NEPA) in certain respects, but rejected plaintiffs' other claims. 486 F.Supp. 332 (D.D.C.1980). All the ESA and NEPA issues were resolved on appeal in the Government's favor by this court in a unanimous opinion, and the district court's disposition adverse to plaintiff of the other issues was upheld. 642 F.2d 589 (D.C.Cir.1980)
 
 
 [5]
 43 U.S.C. § 1349(a)(5) (Supp. IV 1980)
 
 
 [6]
 16 U.S.C. § 1540(g)(4) (1976)
 
 
 [7]
 North Slope Borough v. Andrus, 507 F.Supp. 106, 108 (1981)
 
 
 [8]
 515 F.Supp. at 969
 
 
 [9]
 Id
 
 
 [10]
 Sierra Club v. Gorsuch, 672 F.2d 33, 39 (D.C.Cir.1982). See also infra p. 228
 
 
 [11]
 Sierra Club, 672 F.2d at 35 n.3. See also infra pp. 5-6
 
 
 [12]
 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)
 
 
 [13]
 43 U.S.C. § 1349(a)(5) (Supp. IV 1980) (emphasis added); 16 U.S.C. § 1540(g)(4) (1976) (emphasis added)
 
 
 [14]
 The legislative histories of our provisions are not appreciably different from those of the similar provisions which this court has recently had occasion to analyze. OCSLA's sparse history speaks of "assuring that lessees comply with the law" and that program administrators be kept " 'on their toes.' " S.Rep.No.284, 95th Cong., 1st Sess. 81 (1977). ESA's equally limited history states that its "language is parallel to that contained in the recent Marine, Protection, Research and Sanctuaries Act of 1972, and is to be interpreted in the same fashion." H.R.Rep.No.412, 93d Cong., 1st Sess. 19 (1973). The history of the Act alluded to endorses awards where "the suit was meritorious, and not filed for the sake of mere harassment." S.Rep.No.451, 92d Cong., 1st Sess. 23 (1971); H.R.Rep.No.361, 92d Cong., 1st Sess. 23 (1971). Since similar language was found in the histories of the statutes interpreted in the recent Sierra Club-EDF-Alabama Power trilogy of cases, we are content to rely upon their exposition of the meaning of "appropriate."
 
 
 [15]
 672 F.2d 33 (D.C.Cir.1982)
 
 
 [16]
 Id. at 42 n.10. See generally id. at 35-41
 
 
 [17]
 Id. at 34-41
 
 
 [18]
 672 F.2d 42 (D.C.Cir.1982)
 
 
 [19]
 Id. at 49
 
 
 [20]
 Id
 
 
 [21]
 672 F.2d 1 (D.C.Cir.1982)
 
 
 [22]
 Id. at 3
 
 
 [23]
 Watt v. Energy Action Educ. Found., 454 U.S. 151, 154 n.2, 102 S.Ct. 205, 209 n.2, 70 L.Ed.2d 309 (1981). See also 43 U.S.C. §§ 1801, 1802 (Supp. IV 1980); 124 Cong.Rec. 27,262 (1978) (remarks of Sen. Jackson, the Senate sponsor of OCSLA); 123 Cong.Rec. 23,015-16 (1977) (remarks of Sen. Jackson); California v. Watt, 668 F.2d 1290, 1315-1317 (D.C.Cir.1981); North Slope Borough, 642 F.2d at 595 n.17, 598
 
 
 [24]
 See 43 U.S.C. §§ 1344(d)(3), 1349(c)(2), 1349(d), 1802(1) (Supp. IV 1980); H.R.Rep.No.590, 95th Cong., 1st Sess. 53, 151, 164 (1977); S.Rep.No.284, 95th Cong., 1st Sess. 82 (1977); 124 Cong.Rec. 815 (1978) (remarks of Rep. Murphy); id. at 819 (remarks of Rep. Hughes); id. at 822 (remarks of Rep. Forsythe); id. at 824 (remarks of Rep. Zefferetti); California v. Watt, 668 F.2d 1290, 1326 n.176 (D.C.Cir.1981); North Slope Borough, 642 F.2d at 593-94
 
 
 [25]
 See, e.g., 16 U.S.C. § 1531(b) (1976); 43 U.S.C. §§ 1344(a)(3), 1802 (Supp. IV 1980). We similarly "melded" the divergent statutory goals on the merits. 642 F.2d at 608. See also Conservation Law Found., Inc. v. Andrus, 623 F.2d 712, 714-15 (1st Cir. 1979)
 
 
 [26]
 Government's brief at pp. 44-45 n.34
 
 
 [27]
 Government reply brief at 21 (citing Final Joint Federal/State Issue Document at 73 (16 Oct. 1979), NSB Joint Appendix at 451)
 
 
 [28]
 The order was issued on 8 July 1980, the opinion on 9 October
 
 
 [29]
 See supra p. 225
 
 
 [30]
 672 F.2d at 46
 
 
 [31]
 Id. at 39-40
 
 
 [32]
 Id. at 55
 
 
 [33]
 Id. (quoting decision on the merits, 636 F.2d 1267, 1286 (D.C.Cir.1980))
 
 
 [34]
 Extensively relied on in our opinion on the merits was the Georges Bank litigation, which was resolved within weeks of plaintiffs' initial filings. See Massachusetts v. Andrus, 594 F.2d 872 (1st Cir. 1979), on remand, 481 F.Supp. 685 (D.Mass.1979), motion for injunction pending appeal denied sub nom. Conservation Law Found. v. Andrus, 617 F.2d 296 (1st Cir. 1979), denial of motion for preliminary injunction aff'd, 623 F.2d 712 (1st Cir. 1979). See also Alaska v. Andrus, 580 F.2d 465 (D.C.Cir.), vacated in part as moot, 439 U.S. 992, 99 S.Ct. 594, 58 L.Ed.2d 667 (1978); County of Suffolk v. Secretary of the Interior, 562 F.2d 1368 (2d Cir. 1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); Sierra Club v. Morton, 510 F.2d 813 (5th Cir. 1975)
 
 
 [35]
 642 F.2d at 607-11, 613-14
 
 
 [36]
 657 F.2d 298 (D.C.Cir.1981)
 
 
 [37]
 Our original 20-page decision at 606 F.2d 1068 (D.C.Cir.1979) was then elaborated upon in our 69-page opinion at 636 F.2d 323 (D.C.Cir.1979), which superseded it
 
 
 [38]
 Besides the resolution of the issues they raised, plaintiffs claim that their suit had additional positive effects, namely, the adoption of a new "biological opinion" by the Department of Interior and a redefinition of the scope of "agency action" in § 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2) (Supp. IV 1980). On the latter point, we note that we found ourselves at most only in "qualified agreement" with plaintiffs, 642 F.2d at 608; as for the former, we have some doubt about the substance of the benefits of the changes in the new opinion, since we ruled that the old one was adequate, 642 F.2d at 609-10. The Government also challenges the significance of the changes that were made. Reply brief at 23 n.19-20. At any rate, these contributions are insufficient to merit an award
 
 
 [39]
 North Slope Borough brief at 48 (emphasis added)
 
 
 [40]
 See supra p. 225
 
 
 [41]
 See infra p. 228
 
 
 [42]
 672 F.2d at 42 n.10
 
 
 [43]
 See supra pp. 224-25
 
 
 [44]
 The controlling cases indicate that, while prevailing vel non is not to be a conclusive factor, it may be a relevant consideration. See Sierra Club, 672 F.2d at 36; EDF, 672 F.2d at 49; Alabama Power, 672 F.2d at 3. See also Metropolitan Washington Coalition for Clean Air v. District of Columbia, 639 F.2d 802, 804 (D.C.Cir.1981)
 
 
 [45]
 672 F.2d at 39 (emphasis added)
 
 
 [46]
 62 F.R.D. 353, 355 (D.Del.1974), aff'd mem., 510 F.2d 969 (3d Cir. 1975)
 
 
 [47]
 672 F.2d at 36 n.4
 
 
 [48]
 Brief for Appellees North Slope Borough, et al., at 53-61. The settlement was filed with the district court on 20 January 1981 and embodied in the court order of 3 February 1981. North Slope Borough v. Andrus, 507 F.Supp. 106 (D.D.C.1981)
 
 
 [49]
 Brief for Appellees North Slope Borough at 10; Brief for Appellants at 9-10. Negotiations were predicated on the district court's ruling of 1 May 1980 that plaintiffs were entitled to attorneys' fees, but this was followed by this court's order of 8 July 1980 and opinion of 9 October 1980 reversing the district court on every issue on which plaintiffs had prevailed. See supra notes 4 & 28
 
 
 [50]
 Stipulation of Settlement between Plaintiffs and Federal Defendants Regarding Attorneys' Fees (21 January 1982). See North Slope Borough, 507 F.Supp. at 107
 
 
 [51]
 Notice of Withdrawal from Stipulation (30 January 1981)
 
 
 [52]
 Opposition of Plaintiffs to the Federal Government's Notice of Withdrawal (3 February 1981)
 
 
 [53]
 North Slope Borough, 507 F.Supp. at 108
 
 
 [54]
 Id. at 107-08
 
 
 [55]
 Id. at 108. The court noted that, under the criteria of Copeland v. Marshall, 641 F.2d 880, 890 (D.C.Cir.1980), "the award contained in the stipulation appears modest. Plaintiffs, however, seeking to avoid further litigation, have strongly urged the court to approve that award. It is therefore (approved)." Id
 
 
 [56]
 Defendants' Motion for a Stay of District Court Order (13 Feb. 1981)
 
 
 [57]
 Motion of Plaintiffs North Slope Borough and Village of Kaktovik for Reconsideration and Response to the Federal Parties' Request for a Stay at 5-6 (13 Feb. 1981)
 
 
 [58]
 Id. at 5-8 & n.2; Motion to Amend Attorneys' Fee Award (13 Feb. 1981) (submitted by Plaintiff National Wildlife Foundation)
 
 
 [59]
 On 13 February 1981 plaintiffs moved that the court "reconsider and modify its decision of 3 February, to confirm that the stipulation is binding upon the government, or, in the alternative, to award plaintiffs' attorneys' fees based upon the time and expenses actually incurred." Motion of North Slope Borough, et al. and Village of Kaktovik, et al., for Reconsideration and Response to the Federal Parties' Request for a Stay, at 2 (emphasis added). However, as noted in text, the plaintiffs specified that they were willing to accept the stipulated award only if the government did not appeal. If the government did not comply with this stipulation within the time set out in the original court order, the plaintiffs wished the court to proceed to consideration of the merits of the attorneys' fees claims
 
 
 [60]
 See Mem. op. at 2 (20 Feb. 1981), J.A. at 20
 
 
 [61]
 See supra p. 228 & note 48
 
 
 [62]
 See, e.g., United States v. ITT Continental Baking Co., 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); Glazer v. J. C. Bradford & Co., 616 F.2d 167, 169 (5th Cir. 1980); Cumming v. Johnson, 616 F.2d 1069, 1072 (9th Cir. 1979); Dacanay v. Mendoza, 573 F.2d 1075, 1078-80 (9th Cir. 1978); Clinton Street Greater Bethleham Church v. Detroit, 484 F.2d 185, 188-89 (6th Cir. 1973); Florida Education Ass'n v. Atkinson, 481 F.2d 662, 663 (5th Cir. 1973); Green v. John M. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970); Plymouth Mut. Life Ins. Co. v. Illinois Mid-Continent Life Ins. Co., 378 F.2d 389, 391 (3d Cir. 1967)
 
 
 [63]
 See, e.g., Protective Closures Co. v. Clover Inds., Inc., 394 F.2d 809, 812 (2d Cir. 1968)
 
 
 [64]
 See generally cases cited at note 62 supra
 
 
 [65]
 See, e.g., Dacanay, 573 F.2d at 1078 ("a litigant can no more repudiate a compromise agreement than he could disown any other binding contractual relationship") (citing Autera v. Robinson, 419 F.2d 1197, 1201 n.17)
 
 
 [66]
 See, e.g., Jackson v. Washington Monthly Co., 569 F.2d 119, 120 n.1 (D.C.Cir.1977); Walther & Cie v. United States Fidelity & Guaranty Co., 397 F.Supp. 937, 946 (M.D.Pa.1975)
 
 
 [67]
 See Corbin on Contracts § 1236 n.60 (1964 and Supp.1981)
 
 
 [68]
 See Wood v. Virginia Hauling Co., 528 F.2d 423, 425 (4th Cir. 1975); Kukla v. National Distillers Products Co., 483 F.2d 619, 621 (6th Cir. 1973); Autera, 419 F.2d at 1200 & n.9; Dacanay, 573 F.2d at 1078; Cia Anon Venezolana de Navegacion v. Harris, 374 F.2d 33, 35 (5th Cir. 1967)
 
 
 [69]
 See supra p. 229 and note 59
 
 
 [70]
 North Slope Borough, 507 F.Supp. at 108
 
 
 [71]
 639 F.2d 802 (D.C.Cir.1981). See supra note 55
 
 
 [72]
 See Dacanay, 573 F.2d at 1078; Patterson v. Stovall, 528 F.2d 108, 114 (7th Cir. 1976) (quoting Schleiff v. Chesapeake & Ohio Ry. Co., 43 F.R.D. 175, 178 (S.D.N.Y.1967)); Autera, 419 F.2d at 1201 n.17; Cia Anon Venezolana de Navegacion, 374 F.2d at 35; Leon Inds., Inc. v. ICN Pharmaceuticals, 472 F.Supp. 1241, 1242 (E.D.Mo.1979). Cf. Bernstein v. Brenner, 320 F.Supp. 1080, 1086 (D.D.C.1970) (settlement should not be revised in light of subsequent developments)
 
 
 [73]
 Autera, 419 F.2d at 1199. See also Dacanay, 573 F.2d at 1078 (policy favoring voluntary settlement of disputes); United States v. McInnes, 556 F.2d 436, 441 (9th Cir. 1977) (same)
 
 
 [74]
 See Wood, 528 F.2d at 425-26
 
 
 [75]
 See cases cited at notes 62, 66 supra. Note that the plaintiffs could have recovered not only the amount of fees to be paid under the settlement, but also any consequential damages (such as damages from delay) caused by the government's repudiation. Litigation on the merits therefore was not the only means by which the district court could ensure that the plaintiffs did not suffer from the government's breach
 
 
 [76]
 Because we hold the contract to have been mutually rescinded, we need not reach other issues raised by the parties. We note, however, two additional arguments which independently provide support for our disposition of this case
 First, even if the settlement were deemed to be a valid contract-despite the plaintiffs' successful request that the court ignore the settlement and reach the merits-the district court might not now have jurisdiction to enforce it. Under the Tucker Act, 28 U.S.C. § 1291 (1976), the Court of Claims exercises exclusive jurisdiction over contract claims against the United States in excess of $10,000. See, e.g., Hoopa Valley Tribe v. U. S., 596 F.2d 435 (Ct.Cl.1979); Estate of Watson v. Blumenthal, 586 F.2d 925 (2d Cir. 1978); Atkins v. United States, 556 F.2d 1028 (Ct.Cl.1977), cert. denied, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978); International Engineering Co., Division of A-T-O, Inc. v. Richardson, 512 F.2d 573 (D.C.Cir.1975), cert. denied, 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976). This jurisdiction of the Court of Claims is exclusive even if the claim may seemingly be recharacterized as "arising under the laws of the United States" and thereby brought within the jurisdiction of the district court under 28 U.S.C. § 1331 (Supp. IV 1980). See Estate of Watson, 586 F.2d at 929-34; Bodek v. Dep't of the Treasury, 532 F.2d 277, 279 n.7 (2d Cir.), cert. denied, 429 U.S. 849, 97 S.Ct. 137, 50 L.Ed.2d 122 (1976). The plaintiffs' settlement "contract" would be enforceable, if at all, only in the Court of Claims.
 We see no justification for a different interpretation of the Tucker Act for contracts which settle money claims against the United States. While a few cases assert the "inherent authority" of the district court to enforce a contract settling a dispute pending before it, see, e.g., Autera, 419 F.2d at 1200, none of these cases concern settlements which would otherwise be within the exclusive jurisdiction of the Court of Claims-i.e., settlements awarding sums of greater than $10,000 against the United States. Indeed, in United States v. McInnes, 556 F.2d 436 (9th Cir. 1977), the court took jurisdiction over a settlement contract with the United States under 28 U.S.C. § 1346 (1976 & Supp. IV 1980)-granting district court jurisdiction over claims against the United States up to $10,000 not under 28 U.S.C. § 1331. We may infer that the court would have declined jurisdiction if the amount claimed had exceeded $10,000. Those cases which assert the "inherent jurisdiction" of the district court base this jurisdiction in a court order approving settlement, see, e.g., Fairfax Countywide Citizens Ass'n v. Fairfax County, 571 F.2d 1299, 1304-06 (4th Cir.), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978). No such order was entered in the present case, and there is therefore no basis for district court jurisdiction. If the plaintiffs sought to enforce a live contract, the district court would properly dismiss the action.
 Second, we note that, even if the settlement contract had not been rescinded by the parties, the federal courts would not be bound to enforce it. The Court of Claims has held that "the court is not legally bound to approve a settlement which it finds obligates the Government to pay a sum which the court determines is not properly due.... (W)e (can)not approve a judgment which runs counter to (our own decisions). The courts have final responsibility for interpreting the applicable statutes ...." Russell v. United States, 320 F.2d 920, 925, 162 Ct.Cl. 544 (1963) (emphasis added) (citations omitted). See Cowles v. United States, 50 F.Supp. 242 (Ct.Cl.1943) (refusing to enforce stipulation by the government). More generally, courts undertake "careful scrutiny" of whether the settlement is "fair" and "reasonable" when the interests of the public or non-parties are implicated by the settlement. See United States v. City of Miami, 614 F.2d 1322, 1330-31 (5th Cir. 1980).
 Under these principles, we would decline to enforce the parties' settlement agreement. We have found plaintiffs' counsel clearly not entitled to an attorneys' fees award. See Part I supra. Counsel lost on every issue; the suit did not raise significant issues of first impression. We are responsible "for interpreting the applicable statutes," and we must be mindful of the strong public interest in avoiding excessive fee awards and the litigious conduct such awards foster. These responsibilities would prevent us from enforcing the plaintiffs' purported settlement.
 
 
 [1]
 Sierra Club v. Gorsuch, 672 F.2d 33, 39 (D.C.Cir.1982). See also, Alabama Power Co. v. Gorsuch, 672 F.2d 1 (D.C.Cir.1982); Environmental Defense Fund v. EPA, 672 F.2d 42 (D.C.Cir.1982)
 
 
 [2]
 See Alaska v. Andrus, 580 F.2d 465 (D.C.Cir.), vacated in part as moot, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978); County of Suffolk v. Secretary of the Interior, 562 F.2d 1368 (2d Cir. 1977); Sierra Club v. Morton, 510 F.2d 813 (5th Cir. 1975)
 
 
 [3]
 Massachusetts v. Andrus, 594 F.2d 872 (1st Cir. 1979), on remand, 481 F.Supp. 685 (D.Mass.1979), motion for injunction pending appeal denied sub nom. Conservation Law Foundation v. Andrus, 617 F.2d 296 (1st Cir. 1979), denial of motion for preliminary injunction aff'd, 623 F.2d 712 (1st Cir. 1979)
 
 
 [4]
 Environmental protection is the sole objective of the Endangered Species Act (16 U.S.C. § 1531(b)) and it is also an objective-albeit not the dominant purpose-of the Outer Continental Shelf Lands Act (43 U.S.C. § 1344(a)(3))
 
 
 [5]
 An additional controversial issue is implicated by the majority's conclusion that it is appropriate to consider that the litigation caused a delay in the development of certain energy resources. Majority opinion at 8-9. It is dubious that the denial of attorneys' fees may rest, in whole or in part, on the mere fact that a party is engaged in litigation. See, e.g., Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 449 F.2d 1109, 1128 (D.C.Cir.1971); Greene County Planning Board v. FPC, 455 F.2d 412, 422 (2nd Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). Further, it could well be argued that, if a lawsuit is patently without merit, any delay problems may be cured by the courts themselves (e.g., by summary disposition, denial of a stay). If, on the other hand, the lawsuit appears to have merit, the delay attributable to an appropriate disposition should not be held against the plaintiff. In any event, this is an issue which is best left for decision in a case where, unlike here, it is critical to the outcome
 
 
 [6]
 Since appellees' lawsuits do not raise important new issues, the statutory goals do not matter: appellees would not be entitled to attorneys' fees even if those goals were entirely in the environmental area
 
 
 [7]
 A proposed order was filed at the same time
 
 
 [8]
 United States v. McInnes, 556 F.2d 436, 441 (9th Cir. 1977)
 
 
 [9]
 See, e.g., Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970); Hannon v. Hannon, 426 F.2d 771, 772 (4th Cir. 1970); Autera v. Robinson, supra, 419 F.2d at 1200
 
 
 [10]
 The funds expended pursuant to the settlement agreement would be drawn from Department of Justice appropriations, not those of the Department of the Interior. 31 U.S.C. § 724a
 
 
 [11]
 In view of the fact that the Department of Justice, day in and day out, defends other agencies and settles claims against the government involving them, it is incredible that the Department would not have known that under the law it has the authority to do so without agency consent
 
 
 [12]
 Even in this court, the government persists in claiming that settlement efforts "collapsed" or were "aborted" (Opening Brief at 12, 65). That is simply untrue. As explained above, and as the district court found, there was an agreement but the government "unconscionably reneged on" and "willful(ly) breach(ed)" that contract. J.A. 26, 30
 
 
 [13]
 The Department of Justice has consistently referred to the Department of the Interior as its "client," see, e.g., Reply Brief at 4-5, apparently in an effort to buttress its claim that Interior approval was required to give vitality to the settlement. The Justice Department's client is the United States
 
 
 [14]
 On appeal, the government has made the argument that it disavowed the settlement agreement not because the Assistant Attorney General lacked authority to bind the government but because he allegedly was mistaken in his belief that the Interior Department had been consulted and had concurred. Opening Brief at 11-12, 24-26. That point is equally untenable. Under elementary principles of contract law, a unilateral mistake of fact does not under these circumstances render an agreement invalid or unenforceable. See, e.g., Lee v. Hunt, 631 F.2d 1171, 1177-78 (5th Cir. 1980), cert. denied, 454 U.S. 834, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981); Restatement (Second) of Contracts § 153
 This argument is also inconsistent with the government's theory on appeal that settlement negotiations aborted or collapsed. See note 12 supra. The concept of a collapse of the negotiations implies that appellees somehow contributed to the outcome before they ever bore fruit. It is not clear on what theory that responsibility can be attributed to appellees when, allegedly, the Department of Justice itself did not know at the time it entered into the stipulation that the Interior Department did, would, or might disapprove of a settlement of the attorneys' fees issue. It might also be noted that if the government's argument were accepted, settlements involving the interests of departments or agencies other than the Department of Justice would probably hereafter need to be countersigned by counsel for such agencies to protect those dealing with the government in good faith.
 
 
 [15]
 The court would not have had to consider the rescission issue had it been convinced that, absent Interior Department concurrence, there never was an agreement
 
 
 [16]
 The court was, of course, led into these actions by the government's unjustified disavowal of its contract. But for that disavowal, none of the problems facing either the district court or this court would have arisen
 
 
 [17]
 Copeland v. Marshall, 641 F.2d 880 (D.C.Cir.1980), and its progeny
 
 
 [18]
 The court eventually chose to make a new determination of the attorneys' fees, awarding to appellees an amount considerably in excess of what had previously been awarded. That award is being set aside by today's decision
 
 
 [19]
 It is not clear what else appellees might have done. They probably could not have appealed from the court's decision since the amount of their recovery was equal to that which was stipulated under the settlement. All they could have done therefore-other than what they did-was to await the government's appeal and a likely reversal, at which time there might well have been a new round of litigation. Whether or not that might have been appropriate as a matter of law, the alternative course appellees chose can hardly be regarded as acquiescence in a rescission or as a joint effort with the government to set aside the settlement
 
 
 [20]
 Except for the collateral matters discussed in note 22 infra
 
 
 [21]
 The issue whether a party intended to rescind a contract is one of fact, 12 Williston on Contracts § 1469 (1970), and thus appropriate for the district court
 
 
 [22]
 No other rule of law requires a different result. Thus, there is in my view no merit to the government's claim that the district court lacks jurisdiction to adjudicate this question. It has frequently been held that courts have inherent authority to enforce settlement agreements. Autera v. Robinson, supra, 419 F.2d at 1200. See also Dacanay v. Mendoza, supra, 573 F.2d at 1078; Wood v. Virginia Hauling Co., 528 F.2d 423, 425 (4th Cir. 1975); Kukla v. National Distillers Products Co., 483 F.2d 619 (6th Cir. 1973). The Tucker Act, 28 U.S.C. § 1346, does not limit this authority. Cf. Aro Corp. v. Allied Witan Co., 531 F.2d 1368, 1371-72 (6th Cir.), cert. denied, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976). Similarly, there is in my view no validity to the majority's apparent suggestion that it may be that the settlement agreement could not be enforced even if it is a binding contract. Maj. Op. at p. 231 n.76. The general rule, previously espoused by this court, is that "the actual merits of the settled controversy are without consequence" in assessing a settlement agreement. Autera v. Robinson, supra, 419 F.2d at 1201 n.17. The majority's approach would permit the government to renege on any settlement agreement whenever it concluded that it could achieve a more favorable result through litigating the merits of the dispute