**UNITED STATES of America et al., Appellants,**

v.

**Colin C. McINNES et al., Appellees and Cross-Appellants (Two Cases).**

**Nos. 76–1771 and 76–1812.**

United States Court of Appeals, Ninth Circuit.

June 23, 1977.

Jerome F. McCarthy, Gordon, Thomas Honeywell, Malanca, Peterson & O'Hern, Tacoma, Wash., for cross-appellant/appellees (McInnes, et al).

Frederic D. Cohen, Robert E. Kopp, Attys., App. Section, Civ. Div., Dep. of Justice, Washington, D.C., for appellees/cross-appellants (USA).

Before WRIGHT, KILKENNY and ANDERSON, Circuit Judges.

KILKENNY, Circuit Judge:

Colin McInnes and a group of other federal employees [appellees] sought an award of back pay following a change of their pay schedules. Judgment was ultimately entered against the government. The government appeals from this adverse judgment in No. 76–1771, and the appellees cross-appeal from the denial of a motion for summary judgment in No. 76–1812. We affirm.

## FACTS

The appellees are radiation control monitors employed by the Navy at the Puget Sound Naval Shipyard in Bremerton, Washington. Prior to December 24, 1972, they worked on rotating 90-day shifts; each employee spent one-third of his time on the day shift, one-third on the swing shift, and a final third on the graveyard shift. While working on the swing and graveyard shifts, each employee received, in addition to his regular wage, a "night differential" amounting to 7½% [swing] and 10% [graveyard] of the regular wage.

This action arises out of the December 24, 1972, conversion of the appellees' pay system from the above described "Prevailing

Rate" [5 U.S.C. § 5341 *et seq.*] system to the "General Schedule" [5 U.S.C. § 5332 *et seq.*] pay system. With the guidance of the Civil Service Commission Regulations, 5 CFR § 539.203, the Navy had to convert an employee's "basic pay" under the PR system into a corresponding rate under the GS system. Though the basic pay of a PR employee is defined so as to include the night differentials, 5 U.S.C. § 5343(f), the Navy interpreted the regulation so as to mandate inclusion of a differential only if the employee was actually working a non-day shift on December 24, 1972. It multiplied each employee's hourly rate on December 24, 1972, times 2080 to obtain an annual rate which was then converted into the corresponding rate in the GS system. Thus, employees working on swing and graveyard shifts were credited with their night differentials whereas the appellees, who were working the day shift on December 24, 1972, received no similar credit. The appellees thus received salaries in the GS system lower than their fellow employees. This proceeding was commenced in the district court to recover the differential and thereby bring about salary parity with those employees who did receive credit for the differential.

In an amended complaint, the appellees alleged jurisdiction on the basis of 28 U.S.C. §§ 1346(a)(2), 1361, and sought back pay and an order declaring 5 CFR § 539.203 invalid insofar as it did not comply with the equal pay for equal work principles within the Classification Act, 5 U.S.C. § 5101 *et seq.*

Prior to trial, the parties engaged in extensive negotiations regarding settlement of the back pay claims. The pertinent facts will be stated below, but suffice it to say that the court denied the appellees' summary judgment motion alleging that the government breached a binding settlement agreement.

At the close of the trial, however, the district court did grant the appellees their requested relief. It found the Civil Service Commission regulation invalid as against equal pay for equal work principles, ordered that the appellees' wages be increased to where they would have been if credited with a 10% differential on December 24, 1972, and based an award of back pay upon 28 U.S.C. § 1346(a)(2).

The government complied with the prospective portion of the district court's order by increasing the appellees' pay to the rates they would have been receiving had they been credited with the 10% differential on December 24, 1972, the date of conversion. The government also provided the appellees with back pay from the date that their wages were properly increased to the date of the filing of the court's opinion on December 1, 1975. It refused, however, to provide any back pay for the period from December 24, 1972, through December 1, 1975. It contends that such an award is barred by the doctrine of sovereign immunity. In support, the government relies principally upon *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), a case decided after the district court's decision. Appellees, on the other hand, maintain that *Testan* is distinguishable and that the retroactive award of back pay can be supported by the Back Pay Act, 5 U.S.C. § 5596.

As an alternative means of upholding the district court's award of back pay, the appellees maintain [in their cross-appeal] that the government breached the settlement agreement which provided for such. The government argues, *inter alia*, that no agreement was ever reached.

From *Testan*, it is clear that the district court erroneously considered the Classification Act as creating a substantive right enforceable against the United States. 424 U.S. at 398–405, 96 S.Ct. 948. Though the Back Pay Act did not apply to the factual situation in *Testan*, the Supreme Court noted that under certain circumstances, it [the Back Pay Act] could form the basis for the creation of such a substantive right. Even though the district court here did not construe the Back Pay Act, the government argues that the facts of *Testan* are essentially the same as the facts here and that we must similarly reverse.

While we must acknowledge the superficial similarity between *Testan* and the facts here, there are many reasons why it should not control, including, but not limited to, the fact that *Testan* involved *wrongful classification claims* where there had been no reduction in pay. Here, faced with an action for back pay growing out of the conversion of an employee's "basic pay" under the "Prevailing Rate System" into a corresponding rate under the "General Schedule System", we think that there has been a reduction in pay as required under the Supreme Court's construction of the statute. While affirmance on this theory, with some modification, would appear to be justified, we need not reach a decision on that question.

## ISSUE

In light of our ultimate conclusion, the only issue we decide is whether the district court should have allowed the appellees' motion for summary judgment on the basis of a valid settlement agreement.

## DISCUSSION

In the early stages of the proceedings, the appellees moved the court for a summary judgment on the ground that the parties had agreed to compromise and settle the controversy and that the agreement should be enforced.

The uncontroverted facts presented to the court on the motion reveal that McCarthy, the appellees' attorney, received a call in March of 1975 from the government's attorney, Thomas B. Russell, soliciting [at the request of his superiors in Washington, D. C.] proposals for settlement of all of the appellees' claims, including back pay. Prior to that time, on November 1, 1974, the government was confronted with an adverse decision of the Court of Claims on the interpretation of the Classification Act. *See Testan v. United States*, 499 F.2d 690, 205 Ct.Cl. 330 (1974), in which the court employed the Tucker Act and the Classification Act to hold that it would be empowered to award back pay in the event that the Civil Service Commission made an appropriate determination. We must assume that the adverse decision in *Testan* had something to do with the opening of settlement negotiations by the government.

During the entire period of settlement negotiations and thereafter to the repudiation on September 17, 1975, the Court of Claims' *Testan* decision was in full force and effect, although *certiorari* had been granted by the Supreme Court on February 18, 1975. The grant of *certiorari*, of course, was no indication of victory in the Supreme Court; it meant only that four justices had concluded that it was time for the court to construe the Classification Act. Obviously, that was the position of the government in that it did not solicit proposals for a settlement here until March of 1975, some time after the grant of *certiorari*. Our case, however, had been pending for over one year at the time the government opened the settlement negotiations and had been pending several months prior to the Court of Claims' decision in *Testan*, which favored the position of the appellees. All of this demonstrates the anxiety of the government to bring this litigation to a close.

In any event, following through on the government's proposal for settlement, McCarthy discussed the subject with his clients and on March 24, 1975, directed a letter to the United States Attorney offering three alternative proposals for settlement. McCarthy received a call from Russell in mid or late April, 1975, in which he was informed that Russell's superiors had authorized him to accept Proposal # 3. This provided for an increase in wages and back pay computed as "the precise dollar difference between the amount of wages earned and the amount of wages which would have been earned if the individual plaintiff had been credited with the 10% differential. . . ." On numerous occasions between April and May, McCarthy was assured by Russell that everything was settled and that he was just waiting to receive the back pay checks and the judgment pursuant to stipulation which was being prepared in Washington, D. C.

In early May of 1975, McCarthy spoke several times with the Justice Department Attorney [Carol Freeman] in Washington, D. C. who was handling the case; he was again assured that the parties had a binding settlement and that all that remained was to implement the terms of the agreement.

Because the government had yet to confirm the settlement agreement in writing, McCarthy, by letter of May 20, 1975, to Russell with copy to Freeman, stated his understanding [1] of the agreement and asked confirmation. On each of two occasions in June of 1975, McCarthy received a written confirmation in the form of a memorandum dated June 3, 1975, from Rex E. Lee [Assistant Attorney General] to Stan Pitkin [the U. S. Attorney in Seattle, Washington] authorizing settlement on the basis of what was McCarthy's third proposal. The memorandum stated that the Navy was making the back pay computations based on the 10% differential. The computations and proposed judgment pursuant to stipulation were to be sent in two weeks, but the details took longer than expected.

In mid-July of 1975, McCarthy was assured by Russell that the appellees would receive back pay (computed by the 10% differential) up until the time that their wage rates were adjusted. McCarthy received the Navy's computations of the amount of back pay owed each of the thirty-two appellees in late July or early August of 1975; each appellee agreed that the computations were substantially correct.

Subsequently, McCarthy again received repeated assurances from Russell to the effect that everything was settled and that the back pay checks and judgment pursuant to stipulation would arrive from Washington, D. C. shortly. However, on August 18, 1975, he received a call from Russell in which he learned for the first time that Russell's superiors in Washington, D. C. were *undecided* on whether the government would perform under the terms of the settlement agreement. After a number of additional inquiries, McCarthy was finally informed by Russell on September 17, 1975, that his superiors had decided not to complete performance of the agreement.

When the appellees moved for a summary judgment on the basis of these facts, their motion was denied without opinion. We have studied these facts and must conclude that the district court erred in failing to recognize a valid contract. This contract required the government to do exactly that which is required of it under the district court's judgment, that is, raise the appellees' wages to the point where they would have been if they were credited with the 10% differential, and provide them back pay up until that point.

We regard McCarthy's letter of March 24, 1975, to Pitkin [which contained the three different proposals] as an offer. Even if all the assurances through May of 1975 given by the government attorneys were insufficient to constitute an acceptance, we find a clear manifestation of the government's intent to be bound in Russell's letter of June 10, 1975. McCarthy had previously stated his understanding of the terms of the settlement agreement and asked for confirmation. Russell's response of June 10, 1975, contained a copy of the Justice Department memorandum previously referred to in which settlement is authorized by an Assistant Attorney General on McCarthy's terms. Moreover, we think that the conduct of the parties through June and July of 1975 confirms the fact of this settlement agreement.

■ The government makes a number of arguments against the efficacy of this settlement agreement. First, they argue that the United States Attorney was never authorized to settle for prospective relief, but only for back pay. Viewing the authorization given by the Assistant Attorney General, and the transactions surrounding its issuance, we conclude that the agreement of

---

1. "It is my understanding that the Civil Service Commission has agreed to settle the matter by directing the Navy to pay the plaintiffs the difference between the amount they earned and the amount they would have earned, if credited with the 10% differential, from the date of their conversion to the date their wage rates are adjusted to reflect the 10% differential they were denied on the date of conversion. . . ."

the parties clearly required the wage increase. Indeed, back pay was to be paid based on the 10% differential *until the wages were increased to that rate.*

Second, the government intimates that its agent did not have the authority to do what he did and that an agent in any case cannot waive sovereign immunity. We find clear authorization in 28 CFR § 0.160 [2] for the Assistant Attorney General to compromise and settle the appellees' claims against the United States. Additionally, 28 CFR § 0.168 provides that the Assistant Attorney General may delegate his settlement authority to the United States Attorney.[3] If the Navy objected to the settlement, as the government suggests, then that was for the Assistant Attorney General to consider. *See* 28 CFR § 0.160(b). In any case, it is clear that the Navy not only consented, but actually made the back pay computations for each of the 32 appellees in late July or early August 1975.

■ Next, the government argues that a contract never came into existence because the parties never signed the formal stipulation. We again disagree. Throughout all the transactions under scrutiny, we find no indication of an intent by either party to postpone legal obligations until such a stipulation could be signed. Moreover, this set-

tlement agreement left nothing up to future negotiation. *Cf. Transamerica Equipment Leasing Corp. v. Union Bank,* 426 F.2d 273 (CA9 1970).

■ We are committed to the rule that the law favors and encourages compromise settlements. *Richards Construction Co. v. Air Conditioning Co. of Hawaii,* 318 F.2d 410 (CA9 1963). We recently noted that there is an overriding public interest in settling and quieting litigation. *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 950 (CA9 1976). As stated, *supra,* we find that the parties here did in fact enter into a binding settlement contract. We have examined all of the other arguments advanced by the government against the enforceability of this agreement; we find them to be without merit.

The compromise and settlement agreement being valid, it is enforceable under the provisions of 28 U.S.C. § 1346(a)(2), wherein the United States consents to be sued in the district court on any claim against the United States, not exceeding $10,000.00, which is founded ".  .  . upon any express or implied contract with the United States  .  .  ."[4]

It is our considered view that the district court erred in failing to grant a summary judgment on the basis of the settlement

---

**2.** 28 CFR § *0.160 Offers which may be accepted by Assistant Attorney Generals.*

"Each Assistant Attorney General is authorized with respect to matters assigned to his division, to accept offers in compromise of claims in behalf of the United States in all cases in which the difference between the gross amount of the original claim and the proposed settlement does not exceed $250,000, and of claims against the United States in all cases, or in administrative actions to settle, in which the amount of the proposed settlement does not exceed $250,000, except:

"(a) When for any reason, the compromise of a particular claim, as a practical matter, will control or adversely influence the disposition of other claims totaling more than the respective amounts designated in the preceding part of this section.

"(b) When the Assistant Attorney General is of the opinion that because of a question of law or policy presented, or because of opposition to the proposed settlement by the agency or agencies involved, or for any other reason, the offer should receive the personal attention of the

Deputy Attorney General or the Attorney General."

**3.** 28 CFR § *0.168 Redelegation by Assistant Attorney Generals.*

"(a) The Assistant Attorney Generals are authorized to redelegate, to such extent and subject to such limitations as may be deemed advisable, to subordinate division officials and U.S. Attorneys authority delegated by §§ 0.160, 0.162, 0.164, and 0.172.

"(b) Redelegations under this section shall be in writing and shall be approved by the Deputy Attorney General before becoming effective.

"(c) Existing delegations and redelegations of authority to such officials and U.S. Attorneys to compromise or close claims shall continue in force and effect until modified or revoked by the Assistant Attorney General in charge of the Division concerned."

**4.** None of the claims even remotely approaches the mentioned maximum.

contract between the parties. Consequently, we affirm even though the district court gave the wrong reasons for its judgment. *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937); *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1219 (CA9 1977).

## CONCLUSION

The judgment of the district court is affirmed.

IT IS SO ORDERED.