**DEFENDERS OF WILDLIFE, Natural Resources Defense Council, Sierra Club, Humane Society of the United States, Center for Biological Diversity, Jackson Hole Conservation Alliance, Friends of the Clearwater, Alliance for the Wild Rockies, Oregon Wild, Cascadia Wildlands, Western Watersheds Project, Wildlands Network, and Hells Canyon Preservation Council, Plaintiffs,**

v.

**Ken SALAZAR, Secretary of the Interior, Rowan Gould, Acting U.S. Fish and Wildlife Service Director, and United States Fish and Wildlife Service, Defendants,**

v.

**State of Idaho, Safari Club International, Sportsmen for Fish and Wildlife, Montana Farm Bureau Federation, Idaho Farm Bureau Federation, Mountain States Legal Foundation, State of Montana, Montana Department of Fish, Wildlife and Parks, Governor C.L. "Butch" Otter, National Rifle Association of America, Intervenor–Defendants.**

**Greater Yellowstone Coalition, Plaintiff,**

v.

**Ken Salazar, Secretary of the Interior, Rowan Gould, Acting U.S. Fish and Wildlife Service Director, and United States Fish and Wildlife Service, Defendants.**

Nos. CV 09–77–M–DWM, CV 09–82–M–DWM.

United States District Court, D. Montana, Missoula Division.

April 9, 2011.

Brian K. Gallik, Goetz Gallik & Baldwin, Bozeman, MT, Michael Senatore, Pro Hac Vice, Defenders of Wildlife, Washington, DC, Rebecca Riley, Pro Hac Vice, Natural Resources Defense Council, Chicago, IL, Ryan W. Sudbury, Davis & Sudbury Law, Missoula, MT, James J. Tutchton, Pro Hac Vice, Centennial, CO, Rebecca Kay Smith, Public Interest Defense Center, Summer Lisa Nelson, Western Watersheds Project, Missoula, MT, Deborah A. Sivas, Robb W. Kapla, Pro Hac Vice, Environmental Law Clinic, Stanford, CA, Douglas L. Honnold, Earthjustice Legal Defense Fund, Bozeman, MT, for Plaintiffs.

Michael Richard Eitel, U.S. Department of Justice, Environmental and Natural Resources Division, Wildlife & Marine Resources Section, Denver, CO, Victoria L. Francis, Office of the U.S. Attorney, Billings, MT, for Defendants.

Clive J. Strong, Office of the Attorney General, James David Johnson, Williams Law Firm, Missoula, MT, Lawrence G. Wasden, Idaho State Attorney General, Steven W. Strack, State of Idaho, Anna M. Seidman, Pro Hac Vice, Safari Club International, Washington, DC, Robert Thomas Cameron, Gough Shanahan Johnson & Waterman, Helena, MT, Paul A. Turcke, Pro Hac Vice, Moore Smith Buxton & Turcke, Boise, ID, Robert T. Bell, Reep, Bell & Laird, P.C., Missoula, MT, Hertha L. Lund, Lund Law, Bozeman, MT, Martha M. Williams, Robert N. Lane, Montana Fish, Wildlife and Parks, Helena, MT, Stephen C. Bullock, Office of the Montana Attorney General, David F. Hensley, Pro Hac Vice, Office of the Governor, Boise, ID, Thomas C. Perry, Pro Hac Vice, Species Conservation, Boise, ID, for Intervenor–Defendants.

Grant D. Parker, Rocky Mountain Elk Foundation, Missoula, MT, John I. Kittel, Mazur and Kittel, PLLC, Farmington Hills, MI, Lon J. Dale, Milodragovich Dale Steinbrenner & Binney, Missoula, MT, for Amicus Rocky Mountain Elk Foundation.

## ORDER

DONALD W. MOLLOY, District Judge.

### I. Introduction

■ The ordinary rule applied to any case on appeal is that the District Court that rendered the order to be examined on appeal, has no authority to make any legal ruling in the case while the appeal is pending. The Federal Rules of Civil Procedure recognize that in some circumstances it can be helpful to the parties and to the court of appeals to know what the District Court might do if given the chance to consider some aspect of the appealed case. Federal Rule of Civil Procedure 62.1 allows such indicative rulings when authorized by the court of appeals. Fed. R.App. P. 12.1.

■ The procedure that must be followed under Rule 62.1 first involves asking the District Court to indicate what it would do with the question, or at least consider whether there is a serious issue raised. The indicative ruling procedure has at least four steps. First, the appealing parties must be motivated by some concern or issue and specifically ask for an indicative ruling. Second, the District Court is then obliged to indicate its view of the request. If the request is denied, that ends the inquiry. If the District Court is inclined to grant the request for an indicative ruling, the third step is to tell the parties and the Circuit Court of its intent. Finally, it is up to the Circuit Court to decide whether it will send the case back to the District Court and empower the lower court to rule. This case is now at step two.

■ Even when the Rule 62.1 procedure is invoked it is not a *carte blanche* grant of power to the District Court to exercise normative judgement on questions of policy. Rather the District Court is still constrained by the "rule of law." No matter how useful a course of conduct might be to achieve a certain end, no matter how beneficial or noble the end, the limit of power granted to the District Court must abide by the responsibilities that flow from past political decisions made by the Congress. The law cannot be ignored to accommodate a partial settlement. The rule of law does not afford the District Court the power to decide a legal issue but then at the behest of some of the litigants to reverse course and permit what the Congress has forbidden because some of those interested have sensibly, or for other reasons, decided to lay a dispute to

rest. As is discussed below, settlement is a preferable and favored principle when all the parties are in agreement. Settlement gives control to the parties and it provides a rationale for achieving consensus about issues of significant public or private importance. But, settlement is effectively impossible when all parties are not in agreement. It is inappropriate in my view to indicate approval of a settlement that is approved by some of the parties, deplored by others, and protracts the dilemma for all who have been engaged in the litigation dispute.

On August 5, 2010, 729 F.Supp.2d 1207 (D.Mont.2010), the Court ruled in this case that the U.S. Fish & Wildlife Service's (the "Service's") 2009 Final Rule violated the express terms of the Endangered Species Act (the "ESA"). The challenged Final Rule was vacated, restoring ESA protections for the wolves in Idaho and Montana. That decision is now before the Ninth Circuit on appeal. In that case the Federal Defendants and ten of the fourteen Plaintiffs reached a proposed settlement agreement. The agreement, however, is contingent upon the Court partially staying its invalidation of the Agency's Final Rule.

The Settling Parties seek an indicative ruling on whether this court would stay operation of its Order setting aside the Final Rule as to the States of Idaho and Montana only. The proposed stay is predicated on the idea that the Court can and should enter the limited stay under Rule 60(b) of the Federal Rules of Civil Procedure, because to do so would promote recovery of the gray wolf while at the same time resolving this and other related wolf litigation. Many parties to the appeal, and the related litigation, object to any stay because they are opposed to settlement.

Because the Court lacks discretion to provide the relief sought, and because a stay would not comply with the ESA for the duration of the stay, its entry would come at the expense of the Non–Settling Intervenors and Plaintiffs, and the proposed settlement agreement would not resolve the issues surrounding the listing status of the Northern Rocky Mountain distinct population segment ("DPS"). Equity does not warrant granting the Rule 60(b) motion as requested. If all parties involved in the appeal and in the related litigation agreed with the proposed settlement, the Court's involvement would be unnecessary and the answer to this contentious legal problem would be easy. But it ill behooves any court to force a party to take medicine it does not want, except by a determination on the merits.

## II. Background

### A. The Settlement Agreement

On February 23, 2011, the Ninth Circuit granted the parties' joint motion to stay the appeal of the delisting Rule until March 24, 2011. Since then, Federal Defendants and ten of the fourteen Plaintiffs in this case have reached a contingent settlement. The ten "Settling Plaintiffs" are: Defenders of Wildlife, Natural Resources Defense Council, Sierra Club, Center for Biological Diversity, Hells Canyon Preservation Council, Greater Yellowstone Coalition, Jackson Hole Conservation Alliance, Oregon Wild, Cascadia Wildlands Project, and Wildlands Network (formerly the Wildlands Project). The four "Non–Settling Plaintiffs" are: Humane Society of the United States, Friends of the Clearwater, Alliance for the Wild Rockies, and Western Watersheds Project. The states of Idaho and Montana as well as none of the other Defendant Intervenors are a party to the settlement.

The terms of the proposed settlement are set forth in the document (dkt # 187–1). Notably, the agreement does not require Federal Defendants to dismiss their appeal of the underlying judgment in this action. Nor does it require dismissal of the appeals filed by the five sets of Defen-

dant Intervenors in this case. The agreement does not require Federal Defendants to withdraw the challenged § 10(j) Rule, or otherwise explain how the settlement would moot the Non–Settling Plaintiffs' § 10(j) action. It does not answer the question of the Non–Settling Intervenors' and Plaintiffs' appeals nor does it address the Non–Participants' position regarding ongoing litigation.

## B. The Settling Parties' Rule 62.1 Motion for an Indicative Ruling

The Settling Parties want to know, if this Court had jurisdiction over this matter, would it "stay operation of its order vacating and setting aside the [Service's] 2009 delisting rule ... in the States of Idaho and Montana only, until the Service issues a new delisting rule governing the protected status of the [DPS] under the [ESA]." Mot. (dkt # 189–1). In the absence of all parties agreeing to this idea its effect would be to go forward in violation of the ESA. The moving parties argue the Court could enter such a stay under Rule 60(b) through its equitable powers because (a) the Court has discretion to modify its remedy as sought, (b) the settlement agreement will protect wolves by state control for the duration of the stay and (c) the stay will promote the laudable goal settlement.

An Order was entered on March 21, 2011 noting the Motion "appears to raise a substantial issue but" that the Court had "not heard from all interested parties." Order 3 (dkt # 193). An opportunity was given to any party wanting to be heard to file a brief by March 22, 2011. Oral argument on the Motion took place on March 24, 2011.

All four Non–Settling Plaintiffs filed briefs in opposition to the Motion. Their principle argument insists that a legal stay would sacrifice the relief they obtained, and it would do so against their will. As a matter of policy they take the position that a stay would fail to promote the interests of finality or judicial economy. The State of Montana urges the Court to make an indicative ruling in favor of the partial settlement. Montana describes the settlement agreement as a "significant breakthrough" over the heated and protracted decision to delist the region's gray wolf population. Such a characterization may be accurate but does not account for its impact on Intervenors or Plaintiffs who are unwilling to settle. In support of its position Montana argues the wolf population will continue to meet or exceed federal recovery criteria under its management. While the proposition may be accurate, it has a utilitarian ring about it when it comes to the interests of those who object to the settlement. The Safari Club International and the National Rifle Association of America also advised the Court of their positions. They do not support the settlement agreement but say they will not actively challenge it in this litigation. They also inform the Court that they will decide whether to continue to pursue their appeal of the judgment in this case independent of the Court's ruling on this Motion.

On March 25, 2011, Federal Defendants filed a Notice informing the Court that the appeals of the dispositive Order and Judgment in this matter have been selected for inclusion in the Ninth Circuit's mediation program and the appeals are stayed until whichever occurs later: April 25, 2011 or the date of the Court's ruling on the Motion at hand. If everyone agrees to a settlement the matter will end. If they cannot agree the case will continue on its legal odyssey.

## III. Legal Standard

### A. Federal Rule of Civil Procedure 62.1

■ Once a district court is divested of jurisdiction through appeal of a final judgment, it lacks the power to grant a Rule 60(b) motion without a remand from the

court of appeals. *See Davis v. Yageo Corp.*, 481 F.3d 661, 685 (9th Cir.2007). The Rule provides that "[i]f a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed.R.Civ.P. 62.1. Even if the court states that the motion raises a substantial issue it is not bound to grant the motion on remand. Advisory Committee's Note on Fed.R.Civ.P. 62.1.

## B. Federal Rule of Civil Procedure 60(b)

■■■■ Upon "just terms, the court may relieve a party ... from a final judgment, order, or proceeding" if it "(5) ... is no longer equitable; or (6) any other reason that justifies relief." Fed.R.Civ.P. 60(b)(5), (6). Rule 60(b) "does not particularize the factors that justify relief; [instead] it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice.'" *United States v. Washington*, 98 F.3d 1159, 1163 (9th Cir. 1996) (quoting *Klapprott v. United States*, 335 U.S. 601, 614–15, 69 S.Ct. 384, 93 L.Ed. 266 (1949)). A motion seeking such relief must be made "within a reasonable time." Fed.R.Civ.P. 60(c). "What constitutes 'reasonable time' depends upon the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties."[1] *Ashford*

*v. Steuart*, 657 F.2d 1053, 1055 (9th Cir. 1981).

■■■■ Rule 60(b) empowers a district court to vacate its own judgment "when the equities so demand." *Am. Games, Inc. v. Trade Prods., Inc.*, 142 F.3d 1164, 1168 (9th Cir.1998); *see also U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994) (noting an appellate court should vacate a lower court's judgment only under "exceptional circumstances" but a district court may vacate its own judgment if it would be equitable to do so). "When the parties seek vacatur as a condition of settlement, the district court may refuse to vacate the judgment." *Bates v. Union Oil Co. of Cal.*, 944 F.2d 647, 650 (9th Cir. 1991). In making its ruling the district court should apply an equitable balancing test prior to vacating its judgment premised on mootness by way of settlement. "[W]hen an appellant renders his appeal moot by [settlement] ... the district court can decide whether to vacate its judgment in light of 'the consequences and attendant hardships of dismissal or refusal to dismiss' and 'the competing values of finality of judgment and right to relitigation of unreviewed disputes.'" *Dilley v. Gunn*, 64 F.3d 1365, 1370–71 (9th Cir.1995) (quoting *Ringsby Truck Lines, Inc. v. W. Conference of Teamsters*, 686 F.2d 720, 722 (9th Cir.1982)). The purpose of this balancing test allows a district court to consider the consequences of the requested vacatur. *Id.*; *see also Allard v. DeLorean*, 884 F.2d 464, 467 (9th Cir.1989) ("[T]he district court should balance the competing interests of the parties in order to determine whether the judgment below should be vacated.").[2] Notably, the appeal is not

---

1. Non–Settling Plaintiffs argue the Rule 60(b) motion is untimely considering the prejudice the motion causes them. This prejudice, however, would occur regardless of when the motion was filed and as such will be deemed

an equitable consideration and not a factor towards timeliness.

2. The Settling Parties do not ask the Court to vacate its judgment but instead to partially

mooted in the absence of all interested parties joining in the settlement and agreeing to its terms.

## IV. Analysis

The Settling Parties maintain that the equities justify the Court staying its remedy Order for wolves in Idaho and Montana. In doing so, they frame this settlement, which is contingent on the entering of the stay, as an opportunity to remedy the agency's "erroneous interpretation of the ESA" while promoting the Plaintiffs' interests in challenging the validity of the Dept. of the Interior's Solicitor Opinion, "The Meaning of 'In Danger of Extinction Throughout All or a Significant Portion of Its Range' " (the "M–Opinion"), and at the same time ensuring the recovery and long-term sustainability of the wolf population. Br. 18 (dkt # 189–2). Their argument is based on three broad propositions.

## A. Discretion to Leave the Invalid Rule in Place as to Idaho and Montana

Settling Parties acknowledge, at least for the sake of the request for an indicative ruling, that the Service's delisting Rule was based on "an erroneous interpretation" of the statute. Br. 18 (dkt # 189–2). This error was not a technical violation, but amounted to wrongfully removing ESA protections for the endangered species. They now ask the Court if the wolf in Montana and Idaho—an endangered species—can by court action be excused from the ESA's protective provisions. This proposition presents a legal conundrum that goes directly to the ideas behind the rule of law. The policy about listing is a political decision made by Congress. The actual listing determinations are supposed to be based on scientific, not political, evidence. Agency listing determinations are then measured by applicable

legal standards when they are challenged. Therefore, before reaching the equity analysis under Rule 60(b), it is first necessary to determine whether the Court even has the power to issue the requested stay.

■ The Administrative Procedure Act (the "APA") sets forth the standards by which a court reviews an agency action. Under the APA, "[t]he reviewing court *shall* ... hold unlawful and *set aside* agency action ... found to be," inter alia, "not in accordance with law" or "in excess of statutory ... authority." 5 U.S.C. § 706(2) (emphasis added). "The effect of invalidating an agency rule is to reinstate the rule previously in force." *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir.2005). Here, that means because the species in Idaho and Montana were unlawfully delisted, that Agency Rule is invalid and the wolves must be placed back under the protections of the ESA pursuant to the Rule previously in force. The law imposes this requirement.

■ The Settling Parties argue that such an outcome is not mandatory, but instead the Court can exercise its discretion and stay its earlier remedy as to wolves in Idaho and Montana. However, such a determination places the animals in a status which would authorize a "taking" contrary to the ESA. The Court does not have such unfettered discretion.

In the past the Ninth Circuit has held there are circumstances where vacatur of an unlawful Agency rule is not a foregone conclusion. *Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1185 (9th Cir.2004) ("Although not without exception, vacatur of an unlawful agency rule normally accompanies a remand."). In *Idaho Farm Bureau Fed'n v. Babbitt*, the Circuit found the listing of the "Springs

---

stay the judgment. The authority to vacate a judgment by implication includes the authori-

ty to take the less drastic modification of a partial stay of the judgment.

Snail" as endangered was made "without observance of procedure required by law" when the Service failed to offer a government report central to the agency's decision for public comment. 58 F.3d 1392, 1404 (9th Cir.1995). The court then noted "when equity demands" the invalid rule can be left in place "while the agency follows the necessary procedures." *Id.* at 1405. Due to concern "regarding the potential extinction of an animal species," equity weighed "toward leaving the listing rule in place while the [Service] remedie[d] its procedural error and considered anew whether to list" the species. *Id.*; *see also W. Oil & Gas Ass'n v. EPA,* 633 F.2d 803, 813 (9th Cir.1980) (leaving in effect challenged designation of areas violating federal air quality standards during reenactment of the deliberative process so as to avoid an unnecessary thwarting of the operation of the Clean Air Act). The principle inferred is that if the invalid rule provides protection within the meaning of the ESA equity can authorize keeping it in place. Necessarily then, if the rule places the species at risk, equity would not prevail, the law would.

Thus, despite the APA requirement that an invalid rule be vacated, *see* 5 U.S.C. § 706, *Idaho Farm Bureau* provides a reviewing court discretion to leave ESA protections in place pending a remand.[3] Even when the rule suffers from some legal deficiency, relying on equity to leave ESA protections in effect—rather than strip them away—while the agency revisits the issue makes sense given "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby

adopting a policy which it described as 'institutionalized caution.'" *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

In this case the Court is being asked to make a novel equitable determination: that the wolves of Idaho and Montana are legally endangered but it would be more equitable to not protect them as such so that they could be taken under the states' management plans. In essence, the Settling Parties are asking the Court to shape a remedy "that accords with some modicum of common sense and the public weal," and ignore Congress' instruction on how an endangered species must be protected. *Id.* This course seems to run roughshod over Congress' balancing of the equities regarding endangered species.

The Supreme Court has assessed the providence of the courts to evade what Congress mandated in the ESA as such:

Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto. The lines ascribed to Sir Thomas More by Robert Bolt are not without relevance here:

"The law, Roper, the law. I know what's legal, not what's right. And I'll stick to what's legal.... I'm not God. The currents and eddies of right and wrong, which you find such plain-sailing, I can't navigate, I'm no voyager. But in the thickets of the law, oh there I'm a

---

**3.** This Court has entered a similar equitable remedy. In *Alliance for the Wild Rockies v. Lyder,* the Court found the Service's determination of lynx critical habitat to be arbitrary and capricious. The Court then noted to invalidate the rule would reinstate the prior one

that designated much less critical habitat. The Court thus left the arbitrary rule, with its greater protections, in place while the agency revisited the issue. Order 44–45, CV 09–73–M–DWM (dkt # 59).

forester. . . . What would you do? Cut a great road through the law to get after the Devil? . . . And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? . . . This country's planted thick with laws from coast to coast—Man's laws, not God's—and if you cut them down . . . d'you really think you could stand upright in the winds that would blow then? . . . Yes, I'd give the Devil benefit of law, for my own safety's sake." R. Bolt, A Man for All Seasons, Act I, p. 147 (Three Plays, Heinemann ed. 1967).

*Tenn. Valley Auth.*, 437 U.S. at 194, 98 S.Ct. 2279.

"Congress has established procedures to further its policy of protecting endangered species. The substantive and procedural provisions of the ESA are the means determined by Congress to assure adequate protection. Only by requiring substantial compliance with the [ESA]'s procedures can [the Court] effectuate the intent of the legislature." *Sierra Club v. Marsh*, 816 F.2d 1376, 1384 (9th Cir.1987). To craft a remedy that would expose the endangered species in Idaho and Montana to taking while the agency revisits the DPS's listing status would permit a substantial violation of the ESA's substantive provision that "it is unlawful for any person . . . to take [a listed endangered species]." 16 U.S.C. § 1538(a)(1)(B).

This Court has no power to equitably lift the ESA's prohibition on takes of an endangered species in the face of near certain substantive violations of that provision. As discussed below, even if that was not the case, the equities do not compel the relief requested.

## B. The Settlement's Protection of Wolves in Idaho and Montana

There is no question that the Settling Parties are seeking in good faith to lay the wolf cases to rest. They maintain that the settlement, a product of months of negotiations, is a balanced compromise that furthers the protections of wolves in Idaho and Montana. They argue that due to the monitoring, the status reviews and the independent assessment called for in the proposed settlement agreement, the wolves will not suffer "great harm" if the Court stays its judgment and allows wolves in Idaho and Montana to be managed by the states. The state management plans are identical to the ones the Service relied upon in issuing its delisting Rule.

 Plaintiffs challenged those plans as unacceptable because the Rule allowed each state to manage for only 150 wolves. The complaint also argued the current number of wolves is too low for delisting and to eliminate ESA protections will cause irreparable harm to the species. Compl. ¶¶ 22, 43, 61 (dkt # 1). These claims were not reviewed because the Rule's unlawful delisting of part of a DPS subsumed those issues. The requested stay would short circuit the legal finding that Congress has limited division of a species for management purposes to nothing smaller than an identified DPS. It would further preclude consideration of all the other challenges raised by the Plaintiffs that have not yet been decided.

This problem is confronted by pointing to certain provisions in the settlement agreement as ensuring the endangered species' viability for the duration of the stay. The agreement requires the Service to monitor the status of the DPS pursuant to its requirement under § 4(g) of the ESA and within four years to secure an independent assessment of whether the species population is being sustainably managed. These provisions, however, offer little in the way of substantive protections to the DPS. Most of the monitoring is

already required by the ESA. The independent assessment, which will not commence for at least three years, might assist in assessing the soundness of a some future delisting decision but it does not translate into tangible protections for the species in the interim.

Considering the interests of the Non–Settling Parties, the agreement does not provide a firm deadline for how long the stay would remain in place;[4] nor does it set a floor for the species viability numbers or provide a threshold at which point the wolves would return to federal management. Because the length of the stay is indefinite, because the management requirements are indefinite, and because there are limited added protections, the settlement agreement does not safeguard the Non–Settling Plaintiffs' interest in the viability of the DPS so as to justify exempting the species from the ESA's protective provisions.[5]

The parties that have reached a proposed settlement also note the agreement calls for the withdrawal of the M–Opinion. They justifiably believe the agreement will diminish the public controversy surrounding the issue of wolf management in the northern Rocky Mountain region. However, the withdrawal of the M–Opinion is of little consequence because its legal conclusions are invalid, and its withdrawal offers no added protections for the species. Moreover, while the settlement agreement commits the Federal Defendants to withdraw the opinion, it does not commit them to replace it by a time certain. Because the agreement does not account for the interests of all of the Plaintiffs or Intervenors it will only minimally impact any controversy about wolf management. To the extent that it does so—it accomplishes its end through the means of species "taking" so any gains in public sentiment come in spite of the law and at the expense of the Non–Settling Parties. When many of the parties do not want settlement it would be inequitable to force them to relinquish their litigation position for a perceived greater public good.

## C. Promoting the Laudable Goal of Settlement

▮▮▮▮ Finally, the argument is made that the Court can promote the laudable goal of settlement by entering a stay as requested, and in doing so the stay will be in accord with Ninth Circuit policy that "favors and encourages compromise settlements." *Ahern v. Cent. Pac. Freight Lines*, 846 F.2d 47, 48 (9th Cir.1988). Ninth Circuit policy generally favors settlement. "[T]here is an overriding public interest in settling and quieting litigation." *Id.* (quoting *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir.1977)). "It is well recognized that settlement agreements are judicially favored as a matter of sound public policy. Settlement agreements conserve judicial time and limit expensive litigation." *Id.* (quoting *Speed Shore Corp. v. Denda*, 605 F.2d 469, 473 (9th Cir.1979)).

The policy of promoting settlement does not apply when it is at the expense of the Non–Settling Litigants' legal positions in this case. Given the legal posture of the case, the onus is on the Federal Defendants and Settling Plaintiffs to convince all of the Plaintiffs and Intervenors to settle the dispute. If they cannot convince all

---

4. The closest the agreement comes to providing a deadline is the allowance of the Settling Parties to petition the Service to list the DPS three years after the stay was entered. Settlement Agreement ¶ 11 (dkt # 187–1).

5. Federal Defendants also highlight that the overall population number is healthy and has only declined slightly over the past year. The Non-settling Plaintiffs argue this consideration provides no assurance that the population will continue to be managed to maintain this healthy number.

parties that settlement is the best policy, then they cannot settle with some and ask the court to negate the interests of others.

■■■ The partial settlement as proposed would not limit litigation. It is unclear if a stay would moot the appeal of this case. Despite Federal Defendants commitment to withdraw the M–Opinion, they have not committed to dismissing their appeal, neither have any of the Defendant Intervenors who also filed a notice of appeal. To the extent the appeal is dismissed, the legal issue of whether the ESA allows for a DPS to be protected in only part of its range remains, and will likely be raised in a future case.[6] Even if the current appeal was dismissed, more litigation would be likely, such as challenges to any take based on the ESA's prohibition on taking of endangered species. See 16 U.S.C. § 1538(a)(1)(B). The net result is that a partial settlement is likely to displace rather than "limit" litigation.

Finally there is the proposition that a settlement agreement will "hopefully" resolve the separate wolf litigation pending before the Court, CV 08–14–M–DWM, "challenging the Service's promulgation of a § 10(j) rule for the [northern Rocky Mountain DPS] experimental populations." Br. 6 (dkt # 189–2). The oral agreement effectively negated this policy position. The ten Settling Plaintiffs agree to stipulate to the dismissal with prejudice of their 10(j) claims. Settlement Agreement ¶ 9 (dkt # 187–1). Such a dismissal, however, has no effect on the four Non–Settling Plaintiffs' claims or any of the Intervenors' claims in the case. Nor is there any reason to believe that there would no longer be a case or controversy if the settlement

agreement was approved and executed. Wyoming would continue to have an experimental population of wolves and Federal Defendants have made no categorical representation to withdraw the challenged proposed regulation.

## V. Conclusion

The Court ruled in this case—and for the sake of this Motion the parties do not dispute—that the Final Rule unlawfully delisted wolves in Idaho and Montana. This legal mistake was remedied by invalidating the Rule, which had the effect of putting those wolves back under the protection of the ESA. Congress has clearly determined that animals on the ESA must be protected as such. Because the Court cannot exercise its discretion to allow what Congress forbids, there is no legal authority to grant a Rule 60(b) motion that would put part of an endangered species under state management, exposing the animals to a take. Even if that was not the case, in the absence of an agreement by all parties, a stay of the vacatur of the Final Rule as to Idaho and Montana in combination with the settlement agreement would not comport with the law's mandate and it would prejudice Non–Settling Parties' legal interests in the case. Nor would a stay be likely to encourage a global settlement in light of the stated positions of the litigants. The equities are not persuasive enough to compel the relief the parties seek from the final judgment in this case. Imposition of the proposed settlement would be inequitable to the Non–Settling Parties.

Accordingly, IT IS HEREBY ORDERED that the Settling Parties Joint Motion for an Indicative Ruling on a Joint Motion to Partially Stay the Court's Au-

---

**6.** Two Intervenors, Safari Club International and National Rifle Association of America, have indicated their belief that the settlement agreement does not invalidate or moot the appeal. They also reiterate their support for the withdrawn M–Opinion, suggesting the issue addressed in that opinion will be raised one way or another in a future challenge to a delisting decision.

gust 5, 2010 Judgment (dkt # 187) is DE-NIED.